# In the United States Court of Federal Claims

No. 17-1938
Filed: June 26, 2018
PUBLIC VERSION[*]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **IDEOGENICS LLC,** | 5 U.S.C. § 706 (Administrative Procedure Act, Scope of Judicial Review); |
| Plaintiff, | 15 U.S.C. §§ 632(a)(2)(A) (Establishment of Size Standards), 637(a)(1)(B) (Section 8(a) Program); |
| v. | 28 U.S.C. § 1491(b)(1) (United States Court of Federal Claims Bid Protest Jurisdiction); |
| **THE UNITED STATES,** | 13 C.F.R. §§ 121.103(a)(1)–(5) (General Principles Of Affiliation), (h)(4) ("Ostensible Subcontractor Rule"), 121.1003 (Where Should A Size Protest Be Filed?), 121.1008(d), 121.1009(b) (Basis For Determination), (c) (Burden Of Persuasion), (d) (Weight Of Evidence), (e) (Formal Size Determination), 134.205 (The Appeal File, Confidential Information, And Protective Orders) 134.225 (The Record), 134.306 (Transmission Of The Case File And Solicitation), 134.108(a) (Limitation On New Evidence), 134.314 (Standard Of Review) |
| Defendant, | |
| and | 48 C.F.R. §§ 9.103(a)–(b) (Policy), 9.104-1 (General Standards), 9.104-2 (Special Standards), 52.219-14 (Limitations On Subcontracting), 52.222-17 (Nondisplacement Of Qualified Workers); |
| **EQUITY MORTGAGE SOLUTIONS, LLC,** | Exec. Order. 13495, 74 FED. REG. 6,103 (Feb. 4, 2009); |
| Defendant-Intervenor. | Federal Acquisition Regulation; Nondisplacement of Qualified Workers Under Service Contracts, 77 FED. REG. 75,766 (Dec. 21, 2012); |
| | Rules Of The United States Court Of Federal Claims 5.4(b) (Length), 24(a) (Intervention Of Right), 52.1 (Motion For Judgment On The Administrative Record); |
| | Service Contract Act of 1965, Pub. L. No. 89-286, 79 Stat. 1034 (codified as amended at 41 U.S.C. §§ 6701–6707 (2012). |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Jerry Alfonso Miles**, Deale Services, LLC, Rockville, Maryland, Counsel for Plaintiff.

**Joshua Ethan Kurland**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

**Matthew Thomas Schoonover**, Koprince Law LLC, Lawrence, Kansas, Counsel for Defendant-Intervenor.

---

[*] On June 20, 2018, the court forwarded a sealed copy of this Memorandum Opinion And Final Order to the parties to redact any confidential and/or privileged information from the public version and note any citation or editorial errors that required correction. On June 25, 2018, Plaintiff filed a Motion To Redact, together with proposed redactions. Neither the Government nor Defendant-Intervenor proposed any redactions. After considering the proposed redactions, the court made the redactions that appear in this Memorandum Opinion And Final Order.

**MEMORANDUM OPINION AND FINAL ORDER DENYING PLAINTIFF'S MOTION
FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

**BRADEN**, *Chief Judge.*

On December 13, 2017, Ideogenics LLC ("Ideogenics") filed a Complaint ("Compl.") in the United States Court of Federal Claims to protest a November 16, 2017 decision by the Small Business Administration's Office of Hearings and Appeals ("SBA OHA").  Therein, the SBA OHA ruled that Ideogenics' affiliation with two subcontractors disqualified it from being awarded a contract as a "small business," under a United States Department of Housing and Urban Development ("HUD") procurement.  For the reasons discussed herein, the court has determined that the SBA OHA's decision was not arbitrary, capricious, contrary to law, or without a rational basis.

To facilitate review of this Memorandum Opinion and Final Order, the court has provided the following outline:

I.    Factual Background.
    A.    On November 16, 2016, The Department Of Housing And Urban Development Issued A Solicitation For Home Equity Conversion Mortgage Loan Servicing Support.
    B.    On December 27, 2016, Ideogenics LLC Entered Into Subcontracts With ██████ ███████████████████ and ████████████████████████.
    C.    On December 28, 2016, Ideogenics LLC Submitted A Final Proposal To Provide Home Equity Conversion Mortgage Loan Servicing For The Department Of Housing And Urban Development.
    D.    On June 6, 2017, The Department Of Housing And Urban Development Awarded A Contract To Ideogenics LLC, Under The November 16, 2016 Solicitation.
    E.    On August 8, 2017, A Small Business Administration Area Office Found That Ideogenics LLC Was Not Affiliated With ████████████████████████ Or ████████.
    F.    On August 23, 2017, Equity Mortgage Solutions, LLC Filed An Appeal Of The Small Business Administration Area Office's Size Determination.
    G.    On November 16, 2017, The Small Business Administration's Office Of Hearings And Appeals Reversed The Small Business Administration Area Office's Size Determination.
    H.    On November 22, 2017, The Department Of Housing And Urban Development Terminated The Contract Awarded To Ideogenics LLC.

II.   Procedural History.

III.  Discussion.
    A.    Subject Matter Jurisdiction.
    B.    Standing.
    C.    The Relevant Standards Of Review.

D.      Whether The Small Business Administration's Decision That Ideogenics LLC Was Not A "Small Business" Was Contrary To Law, Not Rational, Or Arbitrary And Capricious.[1]

1.      Because It Misapplied Precedent And Considered "Other Indicia" Of Unusual Reliance (Count VI).
    a.      Ideogenics LLC's Argument.
    b.      The Government's Response.
    c.      Equity Mortgage Solutions, LLC's Response.
    d.      The Court's Resolution.

2.      Because It Misapplied Executive Order 13495 (Count I).
    a.      Ideogenics LLC's Argument.
    b.      The Government's Response.
    c.      Equity Mortgage Solutions, LLC's Response.
    d.      Ideogenics LLC's Reply.
    e.      The Government's Reply.
    f.      Equity Mortgage Solutions, LLC's Reply.
    g.      The Court's Resolution.

3.      Because It Failed to Consider Ideogenics LLC's Past Performance Information (Count II).
    a.      Ideogenics LLC's Argument.
    b.      The Government's Response.
    c.      Equity Mortgage Solutions, LLC's Response.
    d.      Ideogenics LLC's Reply.
    e.      The Government's Reply.
    f.      Equity Mortgage Solutions, LLC's Reply.
    g.      The Court's Resolution.

4.      Because It Misinterpreted Ideogenics LLC's Agreements With ██████ and ██████████ (Count III).
    a.      Ideogenics LLC's Argument.
    b.      The Government's Response.
    c.      The Court's Resolution.

---

[1] The SBA OHA's November 16, 2017 decision analyzed whether Ideogenics violated the "ostensible subcontractor rule," in light of SBA OHA precedent. Tab 44, AR 2775. Therefore, the court begins its analysis with Count VI of the December 13, 2017 Complaint, that challenges the SBA OHA's application of this precedent. Next, the court considers Counts I, II, III, and V, as they relate to specific factors discussed in that precedent for determining whether a contractor is "unusually reliant" on a subcontractor. Finally, the court considers Count IV, regarding the SBA OHA's exclusion of the ████████ from the record and ruling that Ideogenics was "unusually reliant" on a subcontractor for facilities.

5.      Because It Incorrectly Assessed Ideogenics LLC's Management Control (Count V).
  a.      Ideogenics LLC's Argument.
  b.      The Government's Response.
  c.      Ideogenics LLC's Reply.
  d.      The Government's Reply.
  e.      Equity Mortgage Solutions, LLC's Reply.
  f.      The Court's Resolution.

6.      Because It Excluded Evidence On Appeal And Ruled That Ideogenics LLC Was "Unusually Reliant" On A Subcontractor For Facilities (Count IV).
  a.      Ideogenics LLC's Argument.
  b.      The Government's Response.
  c.      Equity Mortgage Solutions, LLC's Response.
  d.      The Court's Resolution.

IV.    Conclusion.

I.    **FACTUAL BACKGROUND.**[2]

   A.    **On November 16, 2016, The Department Of Housing And Urban Development Issued A Solicitation For Home Equity Conversion Mortgage Loan Servicing Support.**

   On November 16, 2016, HUD issued Solicitation No. DU208WR-17-R-0002 (the "Solicitation") for a follow-on home equity conversion mortgage ("HECM") loan servicing support contract to "obtain support for performing nationwide comprehensive reverse mortgage loan servicing activities according to mortgage industry loan servicing standards." Tab 1, AR 13. The Solicitation was set aside for competition among Section 8(a)[3] small businesses, classified under the North American Industry Classification System ("NAICS") Code 522390, with a size standard of $20.5 million.[4]  Tab 1, AR 1, 77, 82.

   The Solicitation provided that offers would be evaluated using a "Best Value Tradeoff process that [would] entail a qualitative evaluation of proposals," based on four factors: (1) "Technical Approach;" (2) "Management;" (3) "Key Personnel;" and (4) "Past Performance." Tab 1, AR 141. Under the "Technical Approach" factor, offerors were required to demonstrate: (1) "logical and feasible methods for meeting the requirements" described in the Solicitation; (2) a "clear understanding of the required operations and HUD requirements;" and (3) a "proposed approach [that] delineates the technical responsibilities between the prime and the subcontractor[s.]" Tab 1, AR 128.

   Under the "Management" factor, offerors were required to address, *inter alia*: "Key Personnel and responsibilities;" "subcontracting arrangements and reporting relationships of all subcontractors;" and "clear lines of authority from the top of the organization to all those working on this effort." Tab 1, AR 129.

   Under the "Key Personnel" factor, offerors were required to submit resumes that "demonstrate[d] sufficient relevant prior experience, qualifications, education, and certification[,]"

---

   [2] The facts discussed herein were derived from the Administrative Record ("Tabs 1–51, AR 1–2883").

   [3] Section 8(a) of the Small Business Act of 1958, Pub. L. No. 85-536, 72 Stat. 384 (1958) (codified as amended at 15 U.S.C. § 637(a)) authorizes the Small Business Administration ("SBA") to provide business development opportunities and assistance by "arrang[ing] for the performance of . . . procurement contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns[.]" 15 U.S.C. § 637(a)(1)(B).

   [4] Federal Acquisition Regulation ("FAR") 52.219-1, cited in the Solicitation, provided that the proper NAICS Code should have been 531311, with a size standard of $15 million. Tab 1, AR 121. Amendment 0001 corrected this mistake. Tab 1, AR 312. NAICS Code 531311 concerns "Residential Property Managers," and "comprises establishments primarily engaged in managing residential real estate for others." *See North American Industry Classification System*, U.S. CENSUS BUREAU, https://www.census.gov/eos/www/naics/index.html (Under "NAICS Search," enter "531311" and select "2017 NAICS Search").

together with  letters of commitment for all key personnel.  Tab 1, AR 129.  The Solicitation identified the following as "Key Personnel:" the "Contract Manager;" the "Alternate Contract Manager;" the "Cash Manager;" the "Loan Servicing Manager;" the "Quality Control Manager;" and the "Title Attorney."  Tab 1, AR 15.

Under the "Past Performance" factor, offerors were required to provide "**all** relevant past performance performed in the *three year period* immediately preceding submission of the proposal and all work currently being performed."  Tab 1, AR 129–30 (bold and italics in original).  Offerors that intended to "subcontract (or use joint ventures/ partners, or other entities other than the prime [c]ontractor to perform) more than 20% of the contract value" were required to submit separate past performance information for the proposed subcontractors.  Tab 1, AR 130.

**B.     On December 27, 2016, Ideogenics LLC Entered Into Subcontracts With ███████████████████████████ and ████████████████████████.**

On December 27, 2016, Ideogenics entered into separate but identical agreements with ███████████ and ████████████████.[5]  Tab 2, AR 510–42.  Each agreement was entitled "████████" and defined the maximum value of each as "██% of the total not to exceed value" of any contract awarded to Ideogenics.  Tab 2, AR 510, 527.  Each agreement also provided that the subcontractors collectively would perform no more than ██% of the work under the contract, but that the subcontractors' combined personnel costs would not exceed ██% of the contract value.  Tab 2, AR 511, 528.  In addition, Ideogenics, ███████, and ███████████ were prohibited from employing "each other's employees who are directly or indirectly associated with the work covered by this Subcontract," without the employer's prior written consent (the "non-employment provision").  Tab 2, AR 516, 533.  Significantly, all parties agreed that the "Subcontractor's personnel who are to perform the services shall be under the employment, and ultimate control, management, and supervision of the subcontractor."  Tab 2, AR 518, 535.  Moreover, no "party shall have the right, power, or authority to obligate or to bind the other in any manner whatsoever, except as agreed to in writing by the [p]arties."  Tab 2, AR 519, 536.  And, each ████████████ agreed to perform ████████████████████████ as agreed upon in [Attachment A.]"  Attachment A required that the ████████████████████ ████████████████████████  Tab 2, AR 512, 523, 529, 540.

**C.     On December 28, 2016, Ideogenics LLC Submitted A Final Proposal To Provide Home Equity Conversion Mortgage Loan Servicing For The Department Of Housing And Urban Development.**

On December 28, 2016, Ideogenics submitted a final proposal in response to the Solicitation.  Tab 2, AR 398–575.  The cover page identified Ideogenics as the offeror, but the Executive Summary disclosed that the contract would be performed by "Team Ideogenics," *i.e.*, Ideogenics, ███████, and ████████████, as explained in a ████████████████ identifying ██ Ideogenics

---

[5] Beginning in 2014, ████████████████████████████████ provided HECM loan servicing support to the HUD, pursuant to Contract No. DU208WR-14-C-01 (the "incumbent contract").  Tab 1, AR 386, 468.

employees and ▉ employees ▉ for ▉ and ▉. Tab 2, AR 398, 408, 431–32, 435. Other than the Contract Manager and Alternate Contract Manager, all managers and supervisors were to be employed by ▉ and ▉. Tab 2, AR 431–32; *see also* Tab 2, AR 438 ▉ ▉. In fact, "all of Team Ideogenics['] proposed [k]ey [p]ersonnel . . . currently [were] working in the same or similar roles on the [incumbent contract]." Tab 2, AR 435. Commitment letters from key personnel also were included providing that, "[s]hould Ideogenics, LLC be selected as the awardee for the subject contract, I am committed to joining Team Ideogenics[.]" Tab 2, AR 446, 449, 452, 455, 458, 460. "[K]ey personnel management and supervision roles and responsibilities" also were described. Tab 2, AR 435–36.

HUD also was advised that

Ideogenics has fully executed teaming agreements and subcontracting agreements in place . . . for defining the relationship we expect during the contract, identifying the types of work expected for each teammate, the roles of their staff, and contractual requirements. Upon contract award, the terms will be incorporated into formal subcontractor agreements that flow down the requirements in Ideogenics['] prime contract[.] Ideogenics is submitting these agreements in our . . . [p]roposal.

Tab 2, AR 436.

In addition, Ideogenics represented that it would "take[] immediate corrective action, such as replacing the person involved or other appropriate action," in the event an employee of either ▉ or ▉ failed to perform emphasizing that "Ideogenics takes full responsibility for the performance of our subcontractors." Tab 2, AR 436.

As required by the Solicitation, Ideogenics' proposal provided that

Ideogenics is a ▉ ▉ ▉ ▉. We offer expertise in ▉ . . . ▉ including business process re-engineering, loan and financial analysis, and housing/mortgage counseling. Additionally, Ideogenics has a deep understanding of the [information technology] systems that support ▉ ▉. ▉ . . . ▉ ▉



Tab 2, AR 462.

Past performance information about ████ and ██████ also was included.  Tab 2, AR 465–72.  As to ████,



Tab 2, AR 465; *see also* Tab 2, AR 464–68.

Ideogenics' proposal described ██████ as



Tab 2, AR 469; *see also* Tab 2, AR 469–72.

### D. On June 6, 2017, The Department Of Housing And Urban Development Awarded A Contract To Ideogenics LLC, Under The November 16, 2016 Solicitation.

On June 6, 2017, HUD awarded a contract under Solicitation No. DU208WR-17-R-0002 to Ideogenics; on that same day, Ideogenics accepted.  Tab 3, AR 579.

On June 8, 2017, Equity Mortgage Solutions, LLC ("EMS") filed a size protest with the Contracting Officer,[6] complaining that Ideogenics was not a "small business" under the applicable

---

[6] SBA regulations require that, to file a size protest with the SBA, an entity must first file the protest "with the contracting officer for the procurement or sale, who must forward the protest to the SBA . . . Area Office serving the area in which the headquarters of the protested concern is located, regardless of the location of any parent company or affiliates."  13 C.F.R. § 121.1003.

NAICS Code, because it was affiliated[7] with two "ostensible subcontractors,"[8] ▮▮▮▮ and ▮▮▮▮. Tab 5, AR 583.

On June 9, 2017, the size protest was referred to a SBA Area Office. Tab 15, AR 780–81. In response, HUD stayed performance of the contract. Tab 6, AR 585.

On June 13, 2017, the SBA Area Office sent a letter (the "June 13, 2017 SBA Area Office letter") to Ideogenics requesting: (1) a response to the allegations and any supporting evidence; (2) a completed Form SBA 355;[9] (3) IRS Form 4506;[10] (4) Ideogenics' technical, cost, past performance, and other proposals submitted in response to the Solicitation; (5) a list of the specific tasks to be performed by Ideogenics and each subcontractor; (6) resumes for all key personnel; (7) information regarding past relationships with the subcontractors; (8) all agreements with subcontractors; and (9) information regarding Ideogenics' past experience in providing the services and tasks required by the Solicitation. Tab 18, AR 798–99.

On June 17, 2017, Ideogenics submitted IRS Form 4506. Tab 19, AR 802.

---

[7] SBA regulations define an "affiliate" as an entity where "one controls or has the power to control the other, or a third party or parties controls or has the power to control both. It does not matter whether control is exercised, so long as the power to control exists." 13 C.F.R. § 121.103(a)(1).

[8] SBA's "ostensible subcontractor rule" provides that a

contractor and its ostensible subcontractor are treated as joint venturers, and therefore affiliates, for size determination purposes. An ostensible subcontractor is a subcontractor that is not a similarly situated entity, as that term is defined in § 125.1 of this chapter, and performs primary and vital requirements of a contract, or of an order, or is a subcontractor upon which the prime contractor is unusually reliant.

13 C.F.R. § 121.103(h)(4).

[9] Form SBA 355, entitled "Information For Small Business Size Determination," requests the following information from a company whose "small business" status has been challenged: NAICS Codes within which the company works; the company's major products and services; owners, partners, and stockholders, as well as percent ownership of voting stock or other interests; annual revenues; number of employees; and other information about possible affiliates. Tab 20, AR 804–11 (Ideogenics' Completed Form SBA 355).

[10] IRS Form 4506, entitled "Request for Transcript of Tax Return," is used to request a copy of a previously filed tax return from the Internal Revenue Service. Tab 19, AR 801–03 (Ideogenics' Completed IRS Form 4506).

On June 19, 2017, EMS also filed a bid protest with the Government Accountability Office ("GAO") challenging HUD's technical and past performance evaluations of Ideogenics' December 28, 2016 proposal.  Tab 10, AR 616–28.

On June 20, 2017, Ideogenics submitted a completed Form SBA 355 showing that: (1) Ideogenics' primary business activities were conducted under NAICS Code 541511; (2) Ideogenics' major products and services included financial and accounting services under NAICS Code 541211 and software development under NAICS Code 541210;[11] and (3) these services together comprised ██% of Ideogenics' sales or receipts for fiscal year 2016.  Tab 20, AR 805–06. The form did not include information about the remaining ██% of Ideogenics' business.  On June 20, 2017, Ideogenics also submitted a response to EMS's small business size status protest and attached other information requested.  Tab 21, AR 812–92.

On July 28, 2017, GAO dismissed EMS's June 19, 2017 bid protest, because HUD represented that it would take voluntary corrective action that included: completing new evaluations; reconsidering the Independent Government Cost Estimate; determining whether discussions or proposal revisions were necessary; and completing a new award determination.  Tab 12, AR 690, 707; Tab 13, AR 709.

On August 1, 2017, the SBA Area Office found that Ideogenics, ████, and ████, respectively, would incur ██%, ██%, and ██% of the total contract labor costs.  Tab 24, AR 1620.  The SBA Area Office also found that Ideogenics, ████, and ████, respectively, would receive ██%, ██%, and ██% of money paid by HUD under the contract.  Tab 24, AR 1621.

**E.  On August 8, 2017, A Small Business Administration Area Office Found That Ideogenics LLC Was Not Affiliated With ████████████████ Or ████████████████.**

In determining whether two entities are affiliated, the SBA Area Office is requested to:

- consider the "totality of the circumstances," 13 C.F.R. § 121.103(a)(5);

---

[11] According to the NAICS Code description, "541210" is not a "valid" NAICS Code.  *See North American Industry Classification System*, U.S. CENSUS BUREAU, https://www.census. gov/eos/www/naics/index.html (Under "NAICS Search," enter "541210" and select "2017 NAICS Search").  The NAICS Manual states that "software development" can be classified under NAICS Code 541511 (Custom Computer Programming Services), and that "software publishers," *i.e.*, entities that "carry out operations necessary for producing and distributing computer software, such as designing, providing documentation, assisting in installation, and providing support services to software purchasers," are classified under NAICS Code 511210.  *See North American Industry Classification System*, U.S. CENSUS BUREAU, https://www.census.gov/eos/www/ naics/index.html (Under "NAICS Search," enter "541511" and select "2017 NAICS Search." Repeat for "511210.").  It is unclear which, if either, of these NAICS Codes Ideogenics intended to include on the Form SBA 355.

- base a formal size determination "primarily on the information supplied by the protestor or the entity requesting the size determination and that provided by the concern whose size status is at issue," *id.* § 121.1009(b);

- evaluate information submitted by "[t]he concern whose size is under consideration" placing the burden of proof on the applicant to establish that it is a "small business," *id.* § 121.1009(c);

- "give greater weight to specific, signed, factual evidence than to general, unsupported allegations or opinions," *id.* § 121.1009(d); and

- "base a formal size determination upon the record, including reasonable inferences from the record, and . . . state in writing the basis for its findings and conclusions," *id.* § 121.1009(e).

On August 8, 2017, the SBA Area Office issued Size Determination No. 2-2017-102, finding that Ideogenics' relationships with ▆▆▆ and ▆▆▆▆▆ did not violate the "ostensible subcontractor rule," because

Ideogenics is managing and performing the majority of the primary and vital requirements of the subject procurement. This finding is supported by the proposed ▆▆▆▆▆ contained in Ideogenics' proposal[.] . . . The ▆▆▆ also reveals that Ideogenics staff will make up the majority of the contract staff[.] Only the [discrete] task areas of ▆▆▆▆▆▆ and ▆▆▆▆▆ are devoid of Ideogenics staff. Additionally, the ▆▆▆ shows that the ultimate supervisory roles for contract performance, the Contract Manager and Alternate Contract Manager, will both be Ideogenics employees as well. However, the mid-level supervisory staff . . . are all assigned to ▆▆▆ [and] ▆▆▆▆▆ . . . . Ideogenics takes ultimate responsibility over all subcontractor action . . . and may take corrective action to remedy [poor performance]. It further stipulates that the Ideogenics Contract Manager ▆ ▆▆▆▆▆▆▆▆▆▆▆ Furthermore, Ideogenics' proposed subcontracting agreements with both ▆▆▆ and ▆▆▆▆ state that any and all communication regarding the contract shall be through Ideogenics. Accordingly, the mid-level managers employed by ▆▆▆ and ▆▆▆▆ are subordinate to the Ideogenics Contract Manager who in turn reports . . . directly to [the] Ideogenics CEO. . . . Thus, the record supports a finding that Ideogenics will manage contract performance.

Tab 25, AR 1625, 1629–31.

The SBA Area Office also explained that:

Notwithstanding a finding that the prime contractor will manage and perform the primary and vital requirements of a contract, the ostensible subcontractor rule may still be violated where there is evidence of the prime contractor's unusual reliance on the subcontractor(s). *DoverStaffing*[ *Inc.*, SBA No. SIZ-5300, 2011 WL 7101064] at [*]7 [(Dec. 14, 2011)]. . . . While analysis of this inquiry, is intensively

fact-specific, a line of [SBA] OHA cases following *DoverStaffing* have identified four "key factors" that contribute to a finding of unusual reliance:

> (1) the proposed subcontractor is the incumbent contractor and is ineligible to compete for the procurement; (2) the prime contractor plans to hire the large marjority of its workforce from the subcontractor; (3) the prime contractor's proposed management previously served with the subcontractor on the incumbent contract; and (4) the prime contractor lacks relevant experience and must rely upon its more experienced subcontractor to win the contract.

*Charitar Realty*[, SBA No. SIZ-5806, 2017 WL 542185,] at [*]13 [(Jan. 25, 2017)]. . . . However, "[w]hen these factors are present, violation of the ostensible subcontractor rule is more likely to be found if the proposed subcontractor will perform 40% or more of the contract." [*Id.*]

Tab 25, AR 1631 (some internal citations omitted) (alteration in original).

In considering the first and third *DoverStaffing* factors, the SBA Area Office found that: (1) ████ and ████████ were the incumbent contractors and not eligible to compete under the Solicitation; and (2) Ideogenics' proposed management previously worked with ████ on that contract.  Tab 25, AR 1631.  Nonetheless, the SBA Area Office concluded that

> the record does not suggest that the employees [Ideogenics] plans to hire from its subcontractors are . . . indicative of unusual reliance.  Ideogenics' plans to hire these employees were made pursuant to Executive Order [13495], "Nondisplacement of Qualified Workers Under Service Contracts," (Executive Order).  74 Fed. Reg. 6103 (Feb. 4, 2009). . . . [The SBA] OHA has stated that in light of the Executive Order, "the hiring of incumbent non-managerial personnel cannot be considered strong evidence of unusual reliance." . . . [The SBA] OHA has also held a prime contractor's plans to hire incumbent managerial personnel alone to be insufficient to establish unusual reliance where the prime has sufficient experience on its own to win and perform the contract. . . . Furthermore, [the SBA] OHA has found no unusual reliance where the prime contractor plans to hire incumbent personnel on an individual basis, where such personnel bear the right of first refusal.  *Spiral* [*Sols. & Techs.*, SBA No. SIZ-5279, 2011 WL 5009339], at [*]28–29[ (Sept. 15, 2011)].

> Ideogenics' proposal stipulates that the incumbent managerial staff will be retained on an individual basis pursuant to the Executive Order. . . . Ideogenics has executed employment agreements for all key personnel.  Furthermore, the proposal contains letters of commitment from each of the key personnel stating that, should Ideogenics be awarded the subject procurement, they are committed to joining Team Ideogenics.  While the mid-level managers will continue as employees of ████ and ████████, [the SBA] OHA has held that a subcontractor may supply such personnel without violating the ostensible subcontractor rule so long as the managers remain subordinate to the prime contractor. . . . [T]he proposed management approach and subcontractor agreements . . . make clear that Ideogenics

will not only manage the contract, but will be ultimately responsible for performance by both its employees and those of its subcontractors. Furthermore, all contract staff, regardless of their employer, are subordinate to Ideogenics' Contract Manager. Therefore, Ideogenics is not unusually reliant upon ███ or ███████ with regard to staffing or managing contract performance.

Similarly, . . . nothing in the record suggests that the decision to award to Ideogenics was due to the experience of its proposed subcontractors. . . . Ideogenics' past performance discusses the successful performance of two contracts for financial portfolio management and reconciliation services. One of these contracts also involved loan support services. While the past performance statements of both ███ and ███████ evidence extensive experience in mortgage loan servicing, nothing in the record suggests that the [Contracting Officer's] decision to award to Ideogenics was based on the experience of its proposed subcontractors. Absent such a finding, the [Contracting Officer's] decision to award to Ideogenics constitutes a determination that it has the relevant experience necessary to win the contract. . . . Thus, Ideogenics is not unusually reliant upon ███ or ███████ with regard to its relevant experience in performing similar contracts.

Tab 25, AR 1631–33.

## F. On August 23, 2017, Equity Mortgage Solutions, LLC Filed An Appeal Of The Small Business Administration Area Office's Size Determination.

On August 23, 2017, EMS filed an appeal of the SBA Area Office's size determination with the SBA OHA. Tab 26, AR 1641. Thereafter, the SBA OHA sent the HUD Contracting Officer a "Fax-Back Memo" that requested information regarding the Solicitation and the applicable NAICS Code. Tab 27, AR 1674. On August 24, 2017, the SBA OHA instructed the Contracting Officer to provide a copy of the Solicitation, with all amendments, and complete the Fax-Back Memo.[12] Tab 28, AR 1675–76. In addition, the Contracting Officer was invited to file a substantive response to the appeal. Tab 28, AR 1676.

On September 7, 2017, EMS requested leave from the SBA OHA to file a supplemental appeal adding that the SBA Area Office erred in concluding that Ideogenics would perform the

---

[12] SBA regulations require that the Contracting Officer, in response to an appeal to the SBA OHA of a SBA Area Office size determination, provide a copy of the Solicitation and all amendments. *See* 13 C.F.R. § 134.306(b) ("[T]he procuring agency contracting officer must immediately send to [the SBA] OHA an electronic link to or a paper copy of both the original solicitation relating to that procurement and all amendments."). In addition, SBA regulations also provide that "[e]vidence not previously presented to the [SBA] Area Office [that] issued the size determination being appealed will not be considered," unless the SBA OHA *sua sponte* "orders the submission of such evidence" or the party files and serves a motion "establishing good cause for the submission of such evidence." *Id.* § 134.308(a). In this case, the Administrative Record does not include any response or completed copy of the Fax Back Memo. The SBA Area Office file, however, includes a copy of the amended Solicitation. Tabs 22, 26–51.

"primary and vital requirements" of the contract.  Tab 35, AR 1707, 1720–24.  In addition, EMS contended that the SBA Area Office erred in concluding that the contract award was not based on ▮▮▮▮▮ and ▮▮▮▮▮▮▮ experience under a prior contract.  Tab 35, AR 1724.

On September 7, 2017, Ideogenics responded and proffered several exhibits.  Tab 36, AR 1733–2700.  Exhibit F was ▮▮▮▮▮▮▮▮ (the ▮▮▮▮▮▮).  Tab 36, AR 2662–2700.

On September 14, 2017, EMS moved to strike the ▮▮▮▮▮▮, because it was not presented to the SBA Area Office and Ideogenics did not properly move to admit it, in accordance with 13 C.F.R. § 134.308(a)(1);[13] in the alternative, EMS moved for leave to respond.  Tab 38, AR 2704–05.

On September 18, 2017, Ideogenics moved for leave to submit the ▮▮▮▮▮▮, explaining that it "did not obtain the appeal file before the due date for its response to the appeal and thus did not have an opportunity to review what was and was not included in the file."  Tab 39, AR 2715–16.

On September 25, 2017, EMS filed a Response arguing that Ideogenics was responsible for obtaining a copy of the appeal file, pursuant to 13 C.F.R. § 134.205, and if the ▮▮▮▮▮ was relevant, Ideogenics should have provided it to the SBA Area Office.  Tab 41, AR 2748–49.  EMS also moved to strike other Ideogenics exhibits, because Ideogenics neither moved to admit these nor provided good cause for admission.  Tab 41, AR 2750.

On September 28, 2017, Ideogenics replied that it was not required to submit copies of the ▮▮▮▮▮ to the SBA Area Office, because ▮▮▮▮▮▮▮▮▮▮.  Tab 42, AR 2753–54.  Ideogenics added that it "filed a motion to submit Exhibit A by implication[,]" because it was relevant, and in any event, it was not unduly burdensome to the SBA OHA.  Tab 42, AR 2754.  On that same day, Ideogenics also filed a Response to EMS's supplemental appeal arguing that the "SBA did not request the information regarding the [Executive Steering Group ("ESG"),] as ▮▮▮▮▮▮▮▮▮▮▮▮▮  Tab 40, AR 2731. Ideogenics' response also included two Exhibits: Exhibit A, a September 18, 2017 declaration from ▮▮▮▮▮▮▮ discussing ▮▮▮▮▮▮▮▮▮▮▮; and Exhibit B, a copy of the June 13, 2017 SBA Area Office letter.  Tab 40, AR 2741–47.

### G.  On November 16, 2017, The Small Business Administration's Office Of Hearings And Appeals Reversed The Small Business Administration Area Office's Size Determination.

On November 16, 2017, the SBA OHA issued a decision, explaining:

[w]hile I agree with the [SBA] Area Office that the first and third [*DoverStaffing*] factors are met, I agree with [EMS] that the [SBA] Area Office clearly erred in its review of the second and fourth factors. . . . Out of its proposed workforce of ▮▮ employees, Ideogenics stated that it would hire "▮▮▮▮▮▮" employees from ▮▮▮▮ and ▮▮▮▮▮▮, and the remaining ▮▮ employees were the key personnel

---

[13] *See supra* note 12.

that Ideogenics also planned to hire from ███. . . . Nor has Ideogenics identified any proposed employees that are not current employees of ███ or ████. Accordingly, because Ideogenics proposed to staff Ideogenics'[] portion of the contract entirely with personnel hired from ███ and █████, the Area Office clearly erred in concluding that the second factor is not met.

Tab 44, AR 2758, 2774.

As to Ideogenics' argument about Executive Order 13495, the SBA OHA observed:

> Ideogenics'[] proposal . . . does not refer to Executive Order [13495], but instead suggests that employees would simply ███████████ ██████ the incumbent contract, and thus would be ██████ . . . Such an approach is equivalent to adopting the incumbent workforce *en masse*. *Modus Operandi*, SBA No. SIZ-5716, [2016 WL 921996,] at [*]12 [(Feb. 19, 2016)]. Moreover, [the SBA] OHA has repeatedly addressed Executive Order [13495] in the context of the *DoverStaffing* line of cases, and has explained that "the Executive Order does not apply to managerial personnel, and does not mandate that a successor contractor will rely upon the incumbent for its entire workforce." *Prof'l Sec.* [*Corp.*], SBA No. SIZ-5548, [2014 WL 1743488,] at [*]9 [Apr. 14, 2014).] . . . Notwithstanding Executive Order [13495], then, a prime contractor may still run afoul of the ostensible subcontractor rule when – as here – it "proposes to rely [on a subcontractor] for virtually all staffing, including both managerial and non-managerial employees, and without contributing [the prime contractor's] own employees or other value to the project beyond [its] small business status." *Id.*

Tab 44, AR 2776.

The SBA OHA, however, found that the SBA Area Office findings were clearly erroneous, because it:

> did not request, or obtain, information as to what impact Ideogenics'[] past performance had on the source selection, or how the procuring agency evaluated Ideogenics'[] past performance relative to that of ███ and █████. Given this absence of information, the [SBA] Area Office could only speculate as to whether ███ and █████ past performance played a significant role in the award decision, and [the SBA] OHA has made clear that an ostensible subcontractor analysis cannot be based on "mere speculation." *Automation Precision Tech.*[, *LLC*], SBA No. SIZ-5850, [2017 WL 4127686,] at [*]18 [(Sept. 6, 2017)]. Moreover, the [SBA] Area Office overlooked indications in the record that Ideogenics lacks relevant experience. Although the RFP directed offerors to submit "**all** relevant past performance performed in the *three year* period immediately preceding submission of the proposal and all work currently being performed," Ideogenics provided two past performance references for itself, neither of which involved mortgage loan servicing. . . . Further, Ideogenics identified no additional relevant projects in response to the [June 13, 2017 SBA Area Office

letter.]   According to Ideogenics'[] . . . SBA Form 355, Ideogenics'[] primary industry is in NAICS [C]ode 541511, Custom Computer Programming Services, and Ideogenics does not generate revenues under the NAICS [C]ode assigned to this procurement, 522390, or under other NAICS [C]odes within NAICS Sector 52 – Finance and Insurance. . . . Further, Ideogenics'[] proposal repeatedly emphasized ████ and ████ experience in performing the incumbent contract but did not state that Ideogenics itself brings such experience[.] Accordingly, the Area Office clearly erred in determining that the fourth factor in the *DoverStaffing* line of cases is not met.  Although the record does not establish whether or not the subcontractors' past performance played a major role in the award decision, the fourth factor of the test is nevertheless met because Ideogenics "lacks experience in the principal subject matter of this procurement." *Modus Operandi*, [2016 WL 921996,] at [*]12; *see also DoverStaffing*, [2011 WL 7101064,] at [*]9.

Tab 44, AR 2774–75 (bold and italics in original) (some citations omitted).

Next, the SBA OHA reasoned that, based on the non-employment provision,

it is not evident that Ideogenics would be able to carry out its plan to hire its workforce from its subcontractors, raising the possibility that these personnel would remain subcontractor employees, and that no Ideogenics personnel would be involved in performing the contract.  In this respect, the instant case is similar to [the SBA] OHA's decision in . . . *Four Winds Services, Inc.*, SBA No. SIZ-5260, [2011 WL 3159674,] at [*]5 ([Jul. 18,] 2011) . . . where [the SBA OHA] found that the challenged firm's proposal was so ambiguous that it was "unclear whether [the prime contractor] proposed to provide any contract employees at all" and that "[i]f [the prime contractor] cannot provide contract employees, it cannot be performing the primary and vital contract requirements."   Likewise, in the instance case, Ideogenics has not explained how its plan to hire subcontractor personnel can be reconciled with the terms of the subcontracts.

Tab 44, AR 2775 (some alterations in original).

Therefore, the SBA OHA concluded that, since the subcontracts at issue did not

prevent or restrict Ideogenics from managing and supervising its subcontractors' work, this is suggestive of unusual reliance.  It is settled law that "[a]mong the main considerations in ostensible subcontractor analysis [is] which concern will be managing the contract." *DoverStaffing*, [2011 WL 7101064], at [*]8.  . . . Second, the subcontracts also provide that subcontractor employees "shall be under the employment, and ultimate control, management, and supervision of the Subcontractor."

*     *     *

> [In fact, four] of the proposed six key personnel, as well as many of the mid-level managerial staff, will be subcontractor employees, and the terms of the subcontract agreements appear to restrict Ideogenics from directly managing its subcontractors or from hiring the proposed Contract Manager and Alternate Contract Manager, who are current ███ employees. . . . Ideogenics'[] CEO appears to be the only current Ideogenics staff member referenced in its proposal, but he has no major role on the contract beyond interfacing with the Contract Manager, Alternate Contract Manager, and the [ESG], which . . . is merely an advisory committee conforming to ordinary contractor meeting practices.  Sections II.B and II.H[.]  [The SBA] OHA has held that tangential involvement by the prime contractor's senior leadership is insufficient to dissipate unusual reliance on a subcontractor."

Tab 44, AR 2775–77 (some citations omitted) (some alterations in original).

In light of the foregoing, the SBA OHA ruled that Ideogenics violated the "ostensible subcontractor rule," as it was "unusually reliant" on ███ and ███ to perform the contract, was "affiliated" with ███ and ███, and not a "small business," under NAICS Code 522390.  Tab 44, AR 2777 (citing *DoverStaffing LLC*, 2011 WL 7101064).  In addition, the SBA OHA denied Ideogenics' September 18, 2017 motion for leave to submit the ███, because "Ideogenics [did] not establish[] good cause to admit new evidence," as it was not submitted to the SBA Area Office nor relevant.  Tab 44, AR 2772.

## H. On November 22, 2017, The Department Of Housing And Urban Development Terminated The Contract Awarded To Ideogenics LLC.

On November 22, 2017, HUD terminated the contract awarded to Ideogenics, based on convenience.  Tab 9, AR 614.

## II.  PROCEDURAL HISTORY.

On December 13, 2017, Ideogenics filed, under seal, a Complaint in the United States Court of Federal Claims.  ECF No. 1.  On that same day, Ideogenics also filed, under seal, a Proposed Redacted Complaint.  ECF No. 4.  In addition, Ideogenics filed the following: (1) a Motion For Temporary Restraining Order And Preliminary Injunction (ECF No. 5) and a Memorandum In Support Of Motion For Temporary Restraining Order And Preliminary Injunction (ECF No. 6); (2) a Motion For Leave To Exceed Page Limit Of Complaint, pursuant to Rule of the United States Court of Federal Claims ("RCFC") 5.4(b) (ECF No. 10); (3) a Motion For Leave To File Under Seal the December 13, 2017 Complaint and the December 13, 2017 Memorandum In Support Of Motion For Temporary Restraining Order (ECF No. 8); and (4) a Motion For Protective Order.  ECF No. 9.

On December 14, 2017, EMS filed an Unopposed Motion To Intervene, pursuant to RCFC 24(a).  ECF No. 12.  On that same day, a telephone status conference was convened.  In addition, the court granted Ideogenics' December 13, 2017 Motion For Leave To File Under Seal and denied, as moot, Ideogenics' December 13, 2017 Motion For Leave To Exceed Page Limit.  ECF No. 14.  The court also denied Ideogenics' Motion For A Temporary Restraining Order And

Preliminary Injunction (ECF No. 15), granted EMS's Unopposed Motion To Intervene (ECF No. 16), and granted Ideogenics' Motion For Protective Order.   ECF No. 18.   On that same day, Ideogenics also filed a Motion For Leave To Amend/Correct The Proposed Redacted Complaint. ECF No. 19.

On December 21, 2017, the parties filed a Joint Status Report And Proposed Schedule. ECF No. 23.

On January 12, 2018, the Government filed a Motion For Leave To File Administrative Record, together with a CD copy.   ECF No. 27.   On January 16, 2018, the court granted the Government's January 12, 2018 Motion.   ECF No. 28.

On February 5, 2018, Ideogenics filed a Motion For Judgment On The Administrative Record.   ECF No. 31.   On February 27, 2018, the Government filed an Unopposed Motion requesting an additional four (4) days to file a Response and Cross-Motion For Judgment On The Administrative Record.   ECF No. 32.   On that same day, the court granted the Government's Unopposed Motion. ECF No. 33.   On February 28, 2018, the court also issued another Scheduling Order, that extended the deadlines for Ideogenics to file a Reply And Response to Cross-Motions and for the Government and EMS to file any Reply.   ECF No. 34.

On March 5, 2018, EMS filed a Response and Cross-Motion For Judgment On The Administrative Record ("Int. Resp.").   ECF No. 35.   On that same day, the Government also filed a Response And Cross-Motion For Judgment On The Administrative Record ("Gov't Resp."). ECF No. 36.   On March 15, 2018, the parties filed an Amended Joint Status Report.   ECF No. 37. On March 16, 2018, Ideogenics filed a Response And Reply to the Government's and EMS's Responses and Cross-Motions ("Pl. Reply").   ECF No. 38.   On March 27, 2018, the Government filed a Reply to Ideogenics' March 16, 2018 pleadings ("Gov't Reply").   ECF No. 39.   On that same day, EMS also filed a Reply to Ideogenics' March 16, 2018 pleadings ("Int. Reply").   ECF No. 40.

## III.   DISCUSSION.

### A.   Subject Matter Jurisdiction.

Subject matter jurisdiction is a threshold issue that a court must determine at the outset of a case.   *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s]' from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884))).

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of Federal Claims has jurisdiction

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency or proposals for a proposed contract or to a proposed award of a contract or any alleged violation of statute or regulation in connection with a

procurement or a proposed procurement. . . . [T]he United States Court of Federal Claims . . . shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1).

The United States Court of Appeals for the Federal Circuit has held that the United States Court of Federal Claims has jurisdiction, pursuant to 28 U.S.C. § 1491(b)(1), to review SBA OHA decisions. *See Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1254 (Fed. Cir. 2015).

In this case, the December 13, 2017 Complaint alleges that the SBA OHA's: (1) interpretation of Executive Order 13495 is contrary to law, without a rational basis, and arbitrary and capricious (Compl. ¶¶ 55–69); (2) evaluation of Ideogenics' past performance is contrary to law, without a rational basis, and arbitrary and capricious (Compl. ¶¶ 70–84); (3) interpretation of Ideogenics' ███████████████ is contrary to law, without a rational basis, and arbitrary and capricious (Compl. ¶¶ 85–99); (4) exclusion of evidence, despite good cause, is contrary to law, without a rational basis, and arbitrary and capricious (Compl. ¶¶ 100–107); (5) assessment of Ideogenics' management control is contrary to law, without a rational basis, and arbitrary and capricious (Compl. ¶¶ 108–121); and (6) application of SBA OHA precedent and consideration "other indicia" of unusual reliance is contrary to law, without a rational basis, and arbitrary and capricious (Compl. ¶¶ 122–134).  If the SBA OHA's decision is, in fact, contrary to law, without a rational basis, or is arbitrary and capricious, Ideogenics may be eligible for contract award, pursuant to the Solicitation.

For these reasons, the court has determined that it has subject matter jurisdiction, under 28 U.S.C. § 1491(b)(1), to adjudicate the allegations in the December 13, 2017 Complaint challenging the merits of the SBA OHA's November 16, 2017 decision.

### B.    Standing.

Standing is a threshold jurisdictional issue.  *See Warth v. Seldin*, 422 U.S. 490, 498 (1975) ("[Standing] is the threshold question in every federal case, determining the power of the court to entertain the suit.").  The party invoking federal jurisdiction bears the burden of establishing standing.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the[] elements [of standing]."); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (same).  To meet this burden at the pleading stage, the complaint must clearly and specifically set forth facts sufficient to satisfy the standing requirements.  *See Spokeo, Inc.*, 136 S. Ct. at 1547 ("Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element."); *see also McKinney v. U.S. Dep't of Treasury*, 799 F.2d 1544, 1557 (Fed. Cir. 1986) ("The facts alleged in the complaint, taken as true for purposes of a standing analysis, must be sufficient to show that a party has suffered, or is likely to suffer, an injury in fact."); 15-101 MARTIN H. REDISH, MOORE'S FEDERAL PRACTICE § 101.31 (2018), LEXIS ("To meet its burden at the pleading stage, the litigant invoking federal jurisdiction must clearly and specifically set forth facts sufficient to satisfy the standing requirement.").

The standing requirements of Article III of the United States Constitution also apply to the United States Court of Federal Claims. *See Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) (holding that the United States Court of Federal Claims, "though an Article I court, . . . applies the same standing requirements enforced by other federal courts created under Article III"). Therefore, to establish standing, a plaintiff must show: (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Figueroa v. United States*, 466 F.3d 1023, 1029 (Fed. Cir. 2006) ("To establish standing, a plaintiff must show that he suffered an injury-in-fact that is both fairly traceable to the challenged conduct of the defendant and likely redressable by a favorable judicial decision.").

The December 13, 2017 Complaint alleges that Ideogenics was awarded a contract, pursuant to HUD Solicitation No. DU208WR-17-R-0002. Compl. ¶¶ 1, 4, 23. HUD, however, was compelled to terminate Ideogenics' Contract, because the SBA OHA determined that Ideogenics was not a "small business" and therefore was ineligible for an award under the Solicitation. Compl. ¶¶ 7, 46. The SBA OHA's November 16, 2017 decision caused Ideogenics to "forfeit a business opportunity . . . worth $48,789,344.00." Compl. ¶ 49. Accordingly, Ideogenics suffered an injury in fact that is concrete, particularized, and actual, not conjectural or hypothetical.

Ideogenics' injury also is fairly traceable to the SBA OHA's decision, *i.e.*, but for the SBA OHA's ruling that Ideogenics was "unusually reliant" on, and therefore "affiliated" with alleged "ostensible subcontractors" ███████ and ███████, Ideogenics' contract would not have been terminated. Compl. ¶¶ 46, 49.

Ideogenics requests, as relief, that the court: (1) determine that the SBA OHA's November 16, 2017 decision was arbitrary and capricious; (2) set aside the November 16, 2017 decision; and (3) reverse and remand the size protest to the SBA OHA for a new decision. Compl. at 40–41. Therefore, Ideogenics' injury is redressable by a favorable decision remanding this case to the SBA OHA.

For these reasons, the court has determined that Ideogenics has standing to request that the court adjudicate the claims alleged in the December 13, 2017 Complaint.

## C.    The Relevant Standards Of Review.

The SBA OHA reviews an SBA Area Office's size determination, "based on clear error of fact or law." 13 C.F.R. § 134.314. Under this standard of review, "[a] finding is clearly erroneous when[,] although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. For S. Cal.*, 508 U.S. 602, 622 (1993) (internal alterations and citation omitted); *see also PGBA, LLC v. United States*, 389 F.3d 1219, 1224 (Fed. Cir. 2004) (same); *Taylor Consultants, Inc.*, SBA No. SIZ-4775, 2006 WL 1484895, at *10 (Apr. 7, 2006) (same). The United States Supreme Court has described the "clearly erroneous" standard as significantly deferential. *See Concrete Pipe*, 508 U.S. at 623 ("[R]eview under the 'clearly erroneous' standard is significantly deferential."). But, the United States Supreme Court has

instructed lower courts and tribunals that the "clearly erroneous" standard "does not entitle a reviewing [body] to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). Nor does the "clearly erroneous" standard permit the reviewing body to "duplicate the role" of the trier of fact by reviewing the decision *de novo*. *Id.* ("In applying the clearly erroneous standard . . . , the [reviewing body] must constantly have in mind that their function is not to decide factual issues *de novo*."). Instead, "[i]f the [trier of fact's] account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing body] may not reverse it[.]" *Id.* at 573–74. Moreover, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574. This is true, "even when the [trier of fact's] findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Id.*

The United States Court of Federal Claims is authorized to review challenges to agency decisions, pursuant to the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706 (2012). *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]").

The United States Court of Appeals for the Federal Circuit has held that the court's primary responsibility is to determine whether a federal agency violated a federal statute or regulation and whether any such violation was prejudicial. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (holding that the plaintiff "must show a clear and prejudicial violation of applicable statutes or regulations") (internal quotation marks and citations omitted); *see also Banknote Corp. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (holding that, when challenging a government contract procurement due to a violation of law or procedure, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations") (citations omitted).

If a federal agency's decision is challenged, because it was made without a rational basis, the trial court's focus is "whether the . . . agency provided a coherent and reasonable explanation of its exercise of discretion, so that the [plaintiff] bears a heavy burden of showing that the . . . decision had no rational basis." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009); *see also Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1287 (Fed. Cir. 2010) ("We must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors.") (internal quotation marks, alterations, and citations omitted); *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1368–69 (Fed. Cir. 2009) ("We have stated that procurement decisions invoke highly deferential rational basis review. . . . Under that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors.") (internal quotation marks, alterations, and citations omitted).

When a court reviews whether a federal agency's decision is arbitrary and capricious, it examines whether an agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015) ("We . . . apply the same 'arbitrary and capricious' standard of review set forth in the [APA], as did the Claims Court[, in reviewing a decision by the SBA OHA].").

    **D.**    **Whether The Small Business Administration's Decision That Ideogenics LLC Was Not A "Small Business" Was Contrary To Law, Not Rational, Or Arbitrary And Capricious.**

        **1.**    **Because It Misapplied Precedent And Considered "Other Indicia" Of Unusual Reliance (Count VI).**

            **a.**    **Ideogenics LLC's Argument.**

Ideogenics argues that the SBA OHA "mechanically adopted and erroneously applied" a four-factor test developed in *DoverStaffing*, although the SBA OHA utilized a seven-factor test in the past.[14] Pl. Mot. at 29 (citing *Taylor Consultants, Inc.*, 2006 WL 1484895, at \*12[+] ("These seven factors are now almost twenty years old; they are neither exclusive nor exhaustive. . . . Therefore, while it is acceptable to consider the seven factors, the [SBA] Area Office must evaluate the totality of the circumstances as it effectively did here.")).[15] By applying the *DoverStaffing* four-factor test, the SBA OHA failed to consider the following issues identified in the *D.P. Associates* seven-factor test: (1) the distribution of work between the prime and subcontractors; (2) who will manage the contract; (3) who has the higher skilled, more expensive staff; and (4) who wrote the proposal. Pl. Mot. at 30. As a result of a "crabbed interpretation of the relevant law and arbitrary evaluation of facts," the SBA OHA arbitrarily ruled that Ideogenics was unduly reliant on, and therefore was affiliated with ▮▮▮▮ and ▮▮▮▮▮▮▮ and therefore not a "small business," under the "ostensible subcontractor rule." Pl. Mot. at 33.

---

    [14] Ideogenics' February 5, 2018 Motion For Judgment On The Administrative Record generically refers to a "seven-factor test." Pl. Mot. at 30. The court's research revealed that the seven-factor test was first adopted in *D.P. Associates, Inc.*, SBA No. 2719, 1987 WL 93680 (Aug. 7, 1987). The seven factors are: (1) "who will manage the contract;" (2) "which party possesses the requisite background and expertise to carry out the contract;" (3) "which party 'chased the contract;'" (4) "what degree of collaboration was there on the bid or proposal;" (5) "are there discrete tasks to be performed by each or is there commingling of personnel and material;" (6) "what is the amount of work to be performed by each;" and (7) "which party performs the more complex and costly contract functions." *D.P. Assocs., Inc.*, 1987 WL 93680, at \*1–2. To avoid confusion with the *DoverStaffing* four-factor test, the court hereinafter refers to the seven-factor test as the "*D.P. Associates* seven-factor test."

    [15] Ideogenics did not provide pinpoint citations for a number of the authorities cited in the February 5, 2018 Motion For Judgment On The Administrative Record and the March 16, 2018 Reply. Likewise, the Government and EMS also occasionally omitted pinpoint citations. Therefore, the court uses the notation "\*+\*" to indicate where a pinpoint citation has been provided by the court.

### b.      The Government's Response.

The Government responds that Ideogenics failed to show that SBA OHA precedent, after *DoverStaffing*, changed the four-factor test, although it is not a "per se" test, as Ideogenics contends.  Gov't Resp. at 35 (citing *Charitar Realty*, 2017 WL 542185, at *13 ("When [the *DoverStaffing*] factors are present, violation of the ostensible subcontractor rule is more likely to be found if the proposed subcontractor will perform 40% or more of the contract.")).  The SBA OHA's consideration of "other indicia" of "unusual reliance" reflected only that the SBA OHA "recognized . . . that 'engaging the incumbent as a subcontractor leads to heightened scrutiny of the arrangement, but is not a *per se* violation' of the ostensible subcontractor rule."  Tab 44, AR 2777 (quoting *InGenesis, Inc.*, SBA No. SIZ-5436, 2013 WL 393479, at *16 (Jan. 28, 2013)).  In addition, the *D.P. Associates* seven-factor test is "neither exclusive nor exhaustive," nor does it "address 'all aspects' of the prime contractor/subcontractor relationship[.]  Instead, [SBA] area offices must, at a minimum, consider the aspects listed in 13 C.F.R. § 121.103(h)(4) and [may] analyze factors outside of the [*D.P. Associates* test, only] if relevant."  *TKTM Corporation*, SBA No. SIZ-4885, 2008 WL 541394, at *18–19 (Jan. 31, 2008).  Therefore, *DoverStaffing* and its progeny require that the SBA OHA consider "all aspects of the relationship between the prime and subcontractor."  Gov't Resp. at 36 (quoting *DoverStaffing*, 2011 WL 7101064, at *7).  In this case, the SBA OHA did so.  Gov't Resp. at 36 (citing Tab 44, AR 2776).

### c.      Equity Mortgage Solutions, LLC's Response.

EMS adds that the SBA OHA "officially turned away from" the *D.P. Associates* seven-factor test.  Int. Resp. at 13 (citing *C&C Int'l Comps. & Consultants, Inc.*, SBA No. SIZ-5082, 2009 WL 5485968, at *11–12 (Nov. 2, 2009) ("[H]enceforth, area offices should apply only the all aspects standard to 13 C.F.R. § 121.103(h)(4) and make no size determination relying upon the [*D.P. Associates*] test. . . . [That test] is not articulated in 13 C.F.R. § 121.103(h)(4), and its use is no longer viewed as beneficial to the all aspects standard[.]")).  Given the SBA OHA's "clear rebuke" of the *D.P. Associates* seven-factor test, the SBA OHA's decision in this case to apply the *DoverStaffing* four-factor test was reasonable.  Int. Resp. at 13.

### d.      The Court's Resolution.

SBA regulations provide the following "general principles of affiliation:"

(1) Concerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both.  It does not matter whether control is exercised, so long as the power to control exists.

(2) [The] SBA considers factors such as ownership, management, previous relationships with or ties to another concern, and contractual relationships, in determining whether affiliation exists.

(3) Control may be affirmative or negative.  Negative control includes, but is not limited to, instances where a minority shareholder has the ability, under the concern's charter, by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders.

(4) Affiliation may be found where an individual, concern, or entity exercises control indirectly through a third party.

(5) In determining whether affiliation exists, [the] SBA will consider the totality of the circumstances, and may find affiliation even though no single factor is sufficient to constitute affiliation.

13 C.F.R. § 121.103(a)(1)–(5).

The "ostensible subcontractor rule" provides that

[a] contractor and its ostensible subcontractor are treated as joint venturers, and therefore *affiliates*, for size determination purposes. An ostensible subcontractor is a subcontractor that is not a similarly situated entity, as that term is defined in [13 C.F.R.] § 125.1 . . . , and performs primary and vital requirements of a contract, or of an order, or is a subcontractor upon which the prime contractor is *unusually reliant*.

*Id.* § 121.103(h)(4) (italics added).

To determine whether a prime contractor is "unusually reliant" on a subcontractor, a SBA Area Office is required to make findings regarding

[a]ll aspects of the relationship between the prime and subcontractor . . . including, but not limited to, the terms of the proposal (such as contract management, technical responsibilities, and the percentage of subcontracted work), agreements between the prime and subcontractor (such as bonding assistance or the teaming agreement), and whether the subcontractor is the incumbent contractor and is ineligible to submit a proposal because it exceeds the applicable size standard for that solicitation.

*Id.* § 121.103(h)(4).

In reviewing a SBA Area Office's determination regarding "unusual reliance" and the "ostensible subcontractor rule," the SBA OHA may reverse a SBA Area Office's determination "based on clear error of fact or law." *Id.* § 134.314. Under this standard of review, "[a] finding is clearly erroneous when[,] although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe*, 508 U.S. at 622 (internal alterations and citation omitted).

In *DoverStaffing*, the SBA OHA considered the requirements of 13 C.F.R § 121.103(h)(4) and identified four "key factors" that demonstrate "unusual reliance." 2011 WL 7101064, at *7–10. These factors are whether: (1) the subcontractor is an incumbent that is ineligible to compete for the procurement; (2) the prime contractor intends to hire a majority of its workforce from the subcontractor; (3) the prime contractor's proposed management previously worked for the subcontractor under the incumbent contract; and (4) the prime contractor has sufficient relevant experience or must rely on the subcontractor to secure the contract. *See id.*; *see also Charitar Realty*, 2017 WL 542185, at *13 (enumerating the *DoverStaffing* four-factor test); *see also Modus Operandi, Inc.*, 2016 WL 921996, at *12 (same). The four factors relate to issues of control,

management, and reliance, and are consistent with the general principle of affiliation requiring consideration of "ownership, management, previous relationships with or ties to another concern, and contractual relationships[.]"  13 C.F.R. § 121.103(a)(2).

The *DoverStaffing* four-factor test, however, is not exclusive, and two or more firms may be affiliated "even though no single factor is sufficient to constitute affiliation."  13 C.F.R. § 121.103(a)(5).  In this case, the SBA OHA considered the four *DoverStaffing* factors as well as "other indicia" of "unusual reliance."  Tab 44, AR 2775 ("[T]he record in this case also contains other indicia of unusual reliance, and thus arguably presents even stronger grounds for affiliation than *DoverStaffing* itself.").  Although Ideogenics argues that the SBA OHA was required to apply the *D.P. Associates* seven-factor test, that test is "not articulated in 13 C.F.R. § 121.103(h)(4), and its use is no longer viewed as beneficial to the all aspects standard explicitly set forth in 13 C.F.R. § 121.103(h)(4)."  *C&C Int'l Comps. & Consultants, Inc.*, 2009 WL 5485968, at *11–12; *see also C.E. Garbutt Constr. Co.*, SBA No. SIZ-5083, 2009 WL 3759784, at *5 (Nov. 2, 2009) ("Ostensible subcontractor appeals are intensely fact specific because the facts underlying these appeals are unique.").

Therefore, the SBA OHA's consideration of the *DoverStaffing* four-factor test, together with "other indicia" is consistent with 13 C.F.R. §§ 121.103(a)(5) and (h)(4), requiring consideration of "all aspects of the relationship" between Ideogenics, ████ and ████████, and the SBA OHA did not omit "an important aspect of the problem."  13 C.F.R. § 121.103(h)(4); *see also State Farm*, 463 U.S. at 43; Tab 44, AR 2773–77.

For these reasons, the court has determined that the SBA OHA's application of precedent and consideration of "other indicia" of unusual reliance was not contrary to law, without a rational basis, nor arbitrary and capricious.

### 2. Because It Misapplied Executive Order 13495 (Count I).

#### a. Ideogenics LLC's Argument.

In a final rule implementing Executive Order 13495,[16] the Federal Acquisition Regulatory Council ("FAR Council")[17] stated that in all contracts, subject to the Service Contract Act of 1965 ("Service Contract Act"),[18] contracting officers should include a clause requiring contractors to provide incumbent employees, who will be terminated after the award of a new contract, the "right of first refusal" of employment under a new contract. Pl. Mot. at 12–13 (citing 77 FED. REG. 75,766 (Dec. 21, 2012) ("Contracting [O]fficers are expected to work with their existing service contractors and bilaterally modify their contracts, to the extent feasible, to include the clause at FAR 52.222-17."[19]). As to key personnel, the FAR Council observed, "[i]f the key person position

---

[16] Executive Order 13495 provides:

[S]ervice contracts and solicitations for such contracts shall include a clause that requires the contractor . . . under a contract that succeeds a contract for performance of the same or similar services at the same location, to offer those employees (*other than managerial and supervisory employees*) employed under the predecessor contract *whose employment will be terminated as a result of the award of the successor contract*, a right of first refusal of employment under the contract in positions for which they are qualified.

Exec. Order 13495, 74 FED. REG. 6,103 (Feb. 4, 2009) (italics added).
     In this case, Executive Order 13495 is relevant, because ███████ was awarded a prior HUD contract, where ████████████████████████. In this case, both of these companies were proposed as subcontractors to Ideogenics, that would be performing under the new contract.

[17] The FAR Council was established, pursuant to 41 U.S.C. § 1302(a), to "assist in the direction and coordination of Government-wide procurement policy and Government-wide procurement regulatory activities in the Federal Government." 41 U.S.C. § 1302(a). The FAR Council is comprised of the Administrator of the Office of Federal Procurement Policy, the Secretary of Defense, the Administrator of the National Aeronautics and Space Administration, and the Administrator of the General Services Administration. *See id.* § 1302(b).

[18] The Service Contract Act applies to all contracts "entered into by the United States of the District of Columbia in excess of $2,500, the principal purpose of which is to furnish services in the United States," and sets forth labor protections for employees who provide services thereunder. *See* Service Contract Act of 1965, Pub. L. No. 89-286, 79 Stat. 1034 (codified as amended at 41 U.S.C. §§ 6701–6707 (2012)).

[19] FAR 52.222-17 provides, in relevant part,

[t]he Contractor and its subcontractors shall, except as otherwise provided herein, in good faith offer those service employees employed under the predecessor contract whose employment will be terminated as a result of award of this contract or the expiration of the contract under which the service employees were hired, a

is covered by the [Service Contract Act], then a qualified employee of the predecessor contractor must be given the right of first refusal."   Analysis of Public Comments, Federal Acquisition Regulation; Nondisplacement of Qualified Workers Under Service Contracts, 77 FED. REG. 75,766, 75,768 (Dec. 21, 2012).

In this case, HUD incorporated Executive Order 13495 into the Solicitation. Tab 22, AR 969, 991.   Therefore, all qualified employees of ████ and ████████, including all key personnel, were afforded the right to continue their employment in the same position under a new contract. *See Bering Straits Logistics Servs., LLC*, SBA No. SIZ-5277, 2011 WL 5083238, at *7 (Sept. 2, 2011) ("The hiring of incumbent personnel is expected, required by Executive Order [13495], and does not constitute undue reliance."); *see also Maywood Closure Co.*, SBA No. SIZ-5499, 2013 WL 5492242, at *7 (Sept. 16, 2013) (no affiliation where a proposed Project Manager under a new contract was an employee of the incumbent, but would become an employee of the prime contractor on contract award).   Therefore, the SBA OHA's ruling in this case that Executive Order 13495 authorizes only the hiring of non-managerial personnel of an incumbent "does not reflect the black letter meaning and intent underlying" Executive Order 13495, because it does not distinguish between managerial and key personnel.   Pl. Mot. at 14.

Therefore, Ideogenics concludes that it was contrary to law for the SBA OHA to "disregard" Ideogenics' compliance with Executive Order 13495 by not hiring employees *en masse* from ████ and ████████.   Pl. Mot. at 14–15.[20]   Specifically, Ideogenics extended offers to two of the six managerial key personnel, who in turn signed letters of commitment, evidencing that Ideogenics proposed "to hire incumbent workforce at the individual level."   Pl. Mot. at 15 (citing Tab 2, AR 410, 441, 444).   Therefore, the SBA OHA's ruling that Ideogenics intended to hire the workforce of ████ and ████████ *en masse* was contrary to law and arbitrary and capricious.   Pl. Mot. at 15.

## b.    The Government's Response.

The Government responds that the "ostensible subcontractor rule" prohibits the hiring of incumbent employees *en masse* and is consistent with Executive Order 13495, because it does not "mandate that a successor contractor will rely upon the incumbent for its entire workforce."   Gov't Resp. at 13 (quoting *Prof'l Sec. Corp.*, 2014 WL 1743488, at *9).   In fact, Executive Order 13495 does not apply to managerial and supervisory employees.   *See* Exec. Order 13495, 74 FED. REG. 6103–06 (Feb. 4, 2009) ("[T]he contractor . . . shall . . . offer those employees (other than managerial and supervisory employees) . . . a right of first refusal of employment under this contract[.]").   In addition, Ideogenics' explanation that it hired employees individually, rather than *en masse*, is not dispositive, because the SBA OHA correctly observed that, "a prime contractor may still run afoul of the ostensible subcontractor rule when . . . it 'proposes to rely upon [a

---

right of first refusal of employment under this contract in positions for which the service employees are qualified.

48 C.F.R. § 52.222-17(b).

[20] Ideogenics did not provide a citation to the Administrative Record to support this argument.

subcontractor] for virtually all staffing, . . . and without contributing [its] own employees or other value to the project beyond its small business status.'" Tab 44, AR 2776 (citing *Prof'l Sec. Corp.*, 2014 WL 1743488, at \*9) (italics added).

Ideogenics' proposal also did not identify any existing Ideogenics employees who would perform the HUD contract at issue; instead, every proposed employee was a current employee of either ▇▇▇▇ or ▇▇▇▇▇▇, neither of which was eligible to compete for this procurement, because both were large businesses. Gov't Resp. at 13 (citing Tab 44, AR 2774); *see also* Tab 21, AR 828; Tab 22, AR 1300, 1302, 1323–24. Therefore, the SBA OHA correctly ruled that the SBA Area Office's finding that Executive Order 13495 and SBA precedent permitted an *en masse* hiring, without violating the "ostensible subcontractor rule," was clearly erroneous. Gov't Resp. at 13.

### c.   Equity Mortgage Solutions, LLC's Response.[21]

EMS adds that the SBA OHA "has routinely held that . . . Executive Order [13495] does not allow a prime contractor to escape a finding of ostensible subcontractor affiliation based on its *en masse* hiring of incumbent personnel." Int. Resp. at 16 (citing *Wichita Tribal Enters.*, SBA No. SIZ-5390, 2012 WL 4208096, at \*10 (Sept. 12, 2012) ("[T]he Executive Order does not apply to managerial personnel, and does not mandate that a successor contractor will rely upon the incumbent for its entire workforce. Thus, . . . when the alleged ostensible subcontractor is the incumbent and the prime contractor proposes to hire, *en masse*, both the workforce and managerial personnel of the alleged ostensible subcontractor, this may be grounds to conclude that the prime contractor is unusually reliant upon the alleged ostensible subcontractor."). Although Ideogenics' proposal emphasized ▇▇▇▇▇▇▇▇▇▇, without mentioning Executive Order 13495, the SBA OHA nevertheless reasonably found a violation of the "ostensible subcontractor rule" based on Ideogenics' proposal. Int. Resp. at 17 (citing Tab 22, AR 1302, 1306; Tab 44, AR 2776; *DoverStaffing*, 2011 WL 7101064, at \*7 ("[A]n ostensible subcontractor case must be analyzed on the basis of . . . the proposal at hand.")).

Because Ideogenics' proposal represented that "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" the SBA OHA was satisfied that the second and third unusual reliance factors were met. Int. Resp. at 15 (citing *Modus Operandi*, 2016 WL 921996, at \*12 (ruling there was "unusual reliance" where "Appellant proposed to staff . . . the project almost entirely with personnel hired from [a subcontractor], and all non-managerial personnel would continue in the 'same role' that they performed on [the incumbent contract.]")).

### d.   Ideogenics LLC's Reply.

Ideogenics replies that it is not true that all contract employees would be hired from ▇▇▇▇ and ▇▇▇▇▇▇, because the proposed ▇▇▇▇▇▇▇▇ is ▇▇▇▇▇▇▇▇▇▇ and not an employee of ▇▇▇▇ or ▇▇▇▇▇▇. Pl. Reply at 6 (citing Tab 2, AR 459). In addition, differentiating between "key personnel" and "managerial and supervisory employees" under Executive Order 13495 is problematic, because all key personnel must be given a right of first

---

[21] Because EMS raises many of the same arguments as the Government, the court has included only those that are not duplicative.

refusal.  Pl. Reply at 6.  In any event, it "█████████████████████████████████
███████████████████████" Pl. Reply at 6.  The agreements Ideogenics entered into with █████ and
██████████ require compliance with all applicable law, including Executive Order 13495.  Tab 2,
AR 517.  Therefore, Ideogenics "should not be punished for observing the law[,]" and it is
"contrary to law, . . . to deny the effect of . . . Executive Order [13495] simply because Ideogenics
did not mention Executive Order 13495 [in its proposal]."  Pl. Reply at 7.

### e.      The Government's Reply.

The Government replies that individuals designated as "key personnel" may or may not be
managerial or supervisory employees and that determines whether they are eligible to receive a
right of first refusal.  Gov't Reply at 4–5 (citing Analysis of Public Comments, Federal Acquisition
Regulation; Nondisplacement of Qualified Workers Under Service Contracts, 77 FED. REG.
75,766, 75,768 (Dec. 21, 2012) ("The definition of 'service employee' . . . provides, in part, that
it 'does not include an individual employed in a bona fide executive, administrative, or
professional capacity[.] . . . [But, i]f the key person position is covered by the [Service Contract
Act], then a qualified employee of the predecessor contractor must be given the right of first
refusal.")).  In this case, even though the contract was subject to the Service Contract Act, the
Contract Manager and Alternate Contract Manager are "executive personnel who presumably
would not be covered by the Service Contract Act, regardless of whether they are designated as
key employees[,]" or whether their duties are managerial or supervisory.  Gov't Reply at 5 (citing
48 C.F.R. § 52.222-17(a) (excluding any person "employed in a bona fide executive,
administrative, or professional capacity")).  Therefore, "[n]othing in Ideogenics' reply refutes (or
even meaningfully disputes) the key fact[]. . . that Ideogenics . . . [will] hir[e] a 'large majority' of
its workforce from its subcontractors."  Gov't Reply at 2 (citing Tab 44, AR 2773).

In addition, none of the cases on which Ideogenics relies stands for the proposition that the
"ostensible subcontractor rule" is not violated "*merely* because the prime contractor proposed to
hire *particular* subcontractor employees."  Gov't Reply at 3 (italics added) (citing Tab 21, AR
828; Tab 22, AR 1300, 1302, 1323–24; Tab 44, AR 2774).

### f.      Equity Mortgage Solutions, LLC's Reply.

EMS adds that the SBA OHA reasonably determined that Ideogenics was "affiliated" with
██████ and █████████, because the "ostensible subcontractor rule" is violated where the prime
contractor: (1) hired incumbent contractors as subcontractors; (2) proposed subcontracting 49% of
the work to those companies; (3) did not define the subcontract work on either a task or cost basis;
and (4) proposed retention of all of the incumbent management in the same positions as under the
prior contract.  Int. Reply at 3 (citing *CWU, Inc.*, SBA No. SIZ-5118, 2010 WL 2196619, at *17
(Mar. 26, 2010) (ruling the "ostensible subcontractor rule" was violated where a proposal exhibited
each of these characteristics).  Although Ideogenics may disagree with the SBA OHA's conclusion
that the record evidenced "unusual reliance" with regard to staffing, Ideogenics failed to show that
conclusion was arbitrary or capricious.  Int. Reply at 9.

g.      The Court's Resolution.

The SBA Area Office found that "Ideogenics plan[ned] to hire subcontractor staff that worked on the incumbent contract" and complied with Executive Order 13495. Tab 25, AR 1631. The SBA Area Office also found that "Ideogenics' proposal stipulates that the incumbent managerial staff will be retained on an individual basis[,]" because "Ideogenics has executed employment agreements for all key personnel" and "the proposal contains letters of commitment from each of the key personnel[.]" Tab 25, AR 1632. Nevertheless, the SBA Area Office concluded that "Ideogenics [was] not hiring a 'large majority' of its workforce from its subcontractors[.]" Tab 25, AR 1633. Therefore, the SBA Area Office found that Ideogenics was not "unusually reliant" on ████ and █████████ for personnel. Tab 25, AR 1632–33.

The SBA OHA, however, ruled that the SBA Area Office's findings were clearly erroneous, not only because Ideogenics' proposal did not mention Executive Order 13495, but also failed to follow a prior SBA OHA decision discussing its import. Tab 44, AR 2774, 2776 (citing *Prof'l Sec. Corp.*, 2014 WL 1743488, at *9 ("[The SBA] OHA has recognized that the hiring of incumbent personnel should no longer be considered strong evidence of reliance, in light of . . . Executive Order [13495] and widespread industry practice. . . . [T]he problem . . . is not merely that Appellant proposed to offer a right of first refusal to [a subcontractor's] employees, but rather that Appellant, having selected [that company] as its sole subcontractor, proposed to rely on [it] for virtually all staffing[.]")); *see also DoverStaffing*, 2011 WL 7101064, at *7 ("[A]n ostensible subcontractor case must be analyzed on the basis of the solicitation and the proposal at hand."). As the SBA OHA explained, Ideogenics proposed to hire ██ individuals from ████ and █████████, including ████ and 2 key personnel, but all other personnel would be ████ and ████████ employees and all proposed key personnel would continue in the same position as they held under the incumbent contract. Tab 44, AR 2760 (summarizing proposal); *see also* Tab 2, AR 435 (Ideogenics' proposal stating, "[A]ll of Team Ideogenics['] proposed Key Personnel . . . currently [were] working in the same or similar roles on the [incumbent contract]."). Therefore, the SBA OHA concluded that, "Ideogenics [has not] identified any proposed employees that are not current employees of ████ or █████████" Tab 44, AR 2774.

It is true that the SBA OHA did not discuss whether the term "key personnel" in the Solicitation was the same as or different from "managerial or supervisory employees" in the text of Executive Order 13495. Tab 44, AR 2776. The record, however, reflects that Ideogenics sourced all staff from ████ and █████████ (Tab 2, AR 408, 410), and belies Ideogenics' representation that it only offered "individuals" the right of first refusal. Pl. Mot. at 15. Therefore, the SBA OHA did not "entirely fail[] to consider" Executive Order 13495, but recognized that it did not preclude finding that Ideogenics planned to hire a majority of the contract workforce from ████ and █████████. Tab 44, AR 2776. As such, the SBA OHA considered the relevant record evidence and provided a coherent explanation for ruling that the SBA Area Office clearly erred in determining that Ideogenics would not hire a "large majority" of its workforce from ████ and █████████. Tab 44, AR 2774, 2776.

For these reasons, the court has determined that the SBA OHA's interpretation of Executive Order 13495 and the record evidence that Ideogenics intended to hire a "large majority" of the proposed workforce from ████ and █████████, was not contrary to law, without a rational basis, nor arbitrary and capricious.

### 3. Because It Failed to Consider Ideogenics LLC's Past Performance Information (Count II).

#### a. Ideogenics LLC's Argument.

Next, Ideogenics argued that, together with █████ and ██████████, it had the collective past performance experience necessary to reduce program risk and provide quality services, *e.g.*, Ideogenics: (1) provided information technology services for ██████████████████████; (2) performed financial reconciliation services for ████████████████████████; and (3) ████████████████████████████████. Pl. Mot. at 17 (citing Tab 2, AR 462–64). Although the Contracting Officer and the SBA Area Office concluded that Ideogenics satisfied the past performance requirements, the SBA OHA did not afford the SBA Area Office findings deference, but instead independently concluded that Ideogenics performed no work in the loan servicing industry. Pl. Mot. at 17–18 (citing Tab 3; Tab 4; Tab 25, AR 1632; Tab 51, AR 2879). Therefore, the SBA OHA incorrectly concluded that the SBA Area Office speculated about Ideogenics' past experience. Pl. Mot. at 18. The SBA Area Office also appropriately relied on information provided by Ideogenics, so it was improper for the SBA OHA to make an independent responsibility determination.[22] Pl. Mot. at 18.

In addition, the SBA OHA concluded that the ████████████ of Ideogenics' past performance references were not ████████████████████████, although it did not ████████████████████████. *Compare* Tab 1, AR 128–29 ("The offeror shall submit . . . **all** relevant past performance performed in the *three year* period immediately preceding submission of the proposal and all work currently being performed[ and] provide a narrative describing the past performance references that reflect the most relevance[.]" (bold and italics in original)), *with Spiral Sols. & Techs.*, 2011 WL 5009339, at \*22 ("[B]ecause offerors had discretion to propose any examples they considered relevant, the fact that Appellant chose to propose only one example of a larger dollar value contract does not establish that no other experience exists."). The SBA OHA also inappropriately relied on *Charitar Realty*, because that case concerned a procurement that defined "similar" past performance, instead of subcontractor past performance information, as was the situation in this case. Pl. Mot. at 30–31.

Although the Solicitation required coordination between the new contractor, █████ and ██████████, the SBA OHA penalized Ideogenics for discussing the advantages of subcontracting with █████ and ██████████. Pl. Mot. at 19 (citing Tab 22, AR 906–09; Tab 51, AR 2881). As such, the SBA OHA acted contrary to *Spiral Solutions and Technologies*, wherein the SBA OHA ruled that a proposal that discussed the benefits of a "qualified incumbent staff" did not evidence that the prime contractor would be unusually reliant on a subcontractor. *See Spiral Sols. & Techs.*, 2011 WL 5009339, at \*29. Instead, Ideogenics explained the benefits of hiring an

---

[22] A responsibility determination is required by the FAR to be made only by the Contracting Officer, who must determine that a prospective contractor has "adequate financial resources to perform the contract, or the ability to obtain them," is "able to comply with the required or proposed delivery or performance schedule," and has "a satisfactory performance record." 48 C.F.R. § 9.104-1. The FAR also provides that a prospective contractor "shall not be determined responsible or nonresponsible solely on the basis of a lack of relevant performance history, except as provided in [48 C.F.R. §] 9.104-2." *Id.*

experienced workforce.  Pl. Mot. at 19 (citing Tab 51, AR 2881).  Therefore, in ruling that Ideogenics did not have relevant past performance experience, the SBA OHA made an improper "responsibility determination,"[23] because only the Contracting Officer can make such a determination.  Pl. Mot. at 20.

### b.    The Government's Response.

The Government responds that the SBA OHA properly considered past performance information as an element of an "ostensible subcontractor" analysis.  Gov't Resp. at 20–21. Although the SBA OHA may not conduct a "broad inquiry into a firm's capabilities," it is "appropriate [for the SBA OHA] to consider a prime contractor's experience, as part of an 'ostensible subcontractor' analysis, [that is] relevant to whether the prime contractor can perform independently from the subcontractor[.]"  *Assessment & Training Sols. Consulting Corp.*, SBA No. SIZ-5228, 2011 WL 2164050, at *6 (Apr. 27, 2011).

Although Ideogenics relies on *Public Communications Services, Inc.*, SBA No. SIZ-5008, 2008 WL 5267230 (Oct. 17, 2008), that case did not determine that consideration of past performance information by the SBA OHA was arbitrary and capricious.  Gov't Resp. at 22. Instead, the SBA OHA in that case declined to consider a prime contractor's financial ability to perform, because that determination must be made by a Contracting Officer.  Gov't Resp. at 22 (citing *Public Commc'ns Servs.*, 2008 WL 5267230, at *8).  In this case, the SBA OHA "properly identified record evidence indicating that Ideogenics lack[ed] the past performance experience to perform independently from its subcontractors."  Gov't Resp. at 22.  Therefore, the SBA OHA's decision that SBA Area Office speculated about Ideogenics' past performance was well-founded. Gov't Resp. at 24.

In addition, ▮▮▮▮ of Ideogenics' past performance references involved ▮▮▮▮ ▮▮▮▮, nor did Ideogenics identify other relevant projects, requested by the June 13, 2017 SBA Area Office letter.  Tab 44, AR 2761, 2775; *see also* Tab 22, AR 1354–56.  Ideogenics' primary NAICS Code is 541511,[24] but it did not generate any revenues under the Solicitation's NAICS Code, *i.e.*, 522390, or any NAICS Code in the Finance and Insurance sector under which the Solicitation was classified, so Ideogenics had no experience in mortgage loan servicing.  Gov't Resp. at 14 (citing Tab 21, AR 806; Tab 44, AR 2775).  Instead, Ideogenics' proposal touted ▮▮▮▮ and ▮▮▮▮▮ experience in performing the incumbent contract.  Gov't Resp. at 14 (citing Tab 22, AR 1300–02, 1354, 1357–64).  Therefore, the SBA OHA's ruling that Ideogenics did not have

---

[23] The FAR provides that "[p]urchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only[]" and that "[n]o purchase or award shall be made[,] *unless the contracting officer* makes an affirmative determination of responsibility."  48 C.F.R. § 9.103(a)–(b) (italics added); *see also* 48 C.F.R. § 9.104-1 (listing criteria to be determined responsible).

[24] NAICS Code 541511 "comprises establishments primarily engaged in writing, modifying, testing, and supporting software to meet the needs of a particular customer."  *See North American Industry Classification System*, U.S. CENSUS BUREAU, https://www.census.gov/eos/ www/naics/index.html (Under "NAICS Search," enter "541511" and select "2017 NAICS Search").

"experience in the principal subject matter of this procurement" was supported by the Administrative Record.  Tab 44, AR 2775 (quoting *Modus Operandi*, 2016 WL 921996, at *12 (ruling the "ostensible subcontractor rule" was violated where a contractor lacked relevant experience and relied solely on subcontractor for that experience)).

### c.     Equity Mortgage Solutions, LLC's Response.[25]

EMS responds that the June 13, 2017 SBA Area Office letter required Ideogenics to "highlight its past experience in providing the services/tasks outlined in the solicitation," but Ideogenics provided no such information.  Int. Resp. at 19–20 (citing Tab 18, AR 799; Tab 44, AR 2775; *see also* 13 C.F.R. § 121.1008(d) (permitting adverse inferences where a protested concern does not provide requested information)).  Instead, Ideogenics' technical proposal relied on ████ and ████████████████████████████████████████████.  Tab 22, AR 1302, 1305, 1323.

The United States Court of Federal Claims has determined that the SBA OHA is the best interpreter of the "ostensible subcontractor rule."  Int. Resp. at 20 (citing *Mark Dunning Indus., Inc. v. United States*, 58 Fed. Cl. 216, 225 (Fed. Cl. 2003) ("[The] SBA is the best interpreter of its own regulations.")).  Therefore, Ideogenics' past performance information is a relevant factor in an "ostensible subcontractor" analysis.  Int. Resp. at 20 (citing *Prof'l Sec. Corp.*, 2014 WL 1743488, at *10 (rejecting an argument that considering the experience in an ostensible subcontractor analysis "is in the nature of a responsibility determination," because the SBA OHA "has repeatedly held that it is appropriate to consider a prime contractor's experience . . . because such matters are relevant to whether the prime contractor can perform independently from the subcontractor")).

In addition, this case is analogous to one where the prime contractor was an information technology services provider with no experience in the required services, but proposed to subcontract with an incumbent contractor, whose experience "resonate[d] throughout the proposal."  Int. Resp. at 21 (quoting *SM Res. Corp.*, SBA No. SIZ-5338, 2012 WL 1892211, at *3, 6–7 (Mar. 27, 2012)).  In that case, the SBA OHA ruled that the prime contractor's "limited experience in contracts of this nature," together with the fact that the proposal was "replete with references to [the subcontractor's] extensive experience in this field, and its performance as the incumbent," supported a finding of unusual reliance and violation of the "ostensible subcontractor rule."  Int. Resp. at 21–22 (quoting *SM Res. Corp.*, 2012 WL 1892211, at *12).

### d.     Ideogenics LLC's Reply.

Ideogenics replies that it has sufficient past performance experience in mortgage loan servicing, because the projects cited in its proposal required "████████████████████████████ ████████████████████████████████████████████████████████████████████████████████"  Pl. Reply at 7 (citing Tab 2, AR 463).  Specifically, Ideogenics' other past performance references included: "████████████████████████████████████████████████████████████████"  and ████████████████████████████████████████████████████████████████████████████████ ████████████████."  Tab 2, AR 464.  In addition, the dollar value of Ideogenics' past performance is

---

[25] Because EMS raises many of the same arguments as the Government, the court has included only those arguments that are not duplicative.

not relevant in an "ostensible subcontractor" analysis and cannot be dispositive.  Pl. Reply at 8 (citing *A-P-T Research, Inc.*, SBA No. SIZ-5798, 2016 WL 8198438 (Dec. 19, 2016)).[26]

### e.    The Government's Reply.

The Government replies that relevant experience under an "ostensible subcontractor" analysis differs from the prime and subcontractors' combined experience that a Contracting Officer considers in making a responsibility determination.   Gov't Reply at 7 (citing *Assessment & Training Sols. Consulting Corp.*, 2011 WL 2164050, at *6 ("[I]t is appropriate to consider a prime contractor's experience as part of an 'ostensible subcontractor' analysis, because such matters are relevant to whether the prime can perform independently from the subcontractor[.]")).

### f.    Equity Mortgage Solutions, LLC's Reply.

EMS adds that, although Ideogenics relies on *A-P-T Research* as support in arguing that the dollar value of past performance efforts should not be dispositive in an "ostensible subcontractor" analysis, that case is distinguishable, because the prime contractor had sufficient experience in each category of work contemplated by the contract and therefore was not affiliated with the subcontractor.  Int. Reply at 10 (citing *A-P-T Research*, 2016 WL 8198438, at *12[+] ("Unlike the situation in *DoverStaffing*, . . . [the company] has experience in each category of work contemplated by the [contract], including several technical disciplines.")).

### g.    The Court's Resolution.

A prime contractor's past experience is relevant to determining whether the "ostensible subcontractor rule" is violated.  *See Assessment & Training Sols. Consulting Corp.*, 2011 WL 2164050, at *6 (ruling that "it is appropriate to consider a prime contractor's experience as part of an 'ostensible subcontractor' analysis, because such matters are relevant to whether the prime can perform independently from the subcontractor").  In this case, the SBA Area Office found that "nothing in the record suggests that the decision to award to Ideogenics was due to the experience of its proposed subcontractors[,]" and that, "[a]bsent such a finding, the [Contracting Officer's] decision to award to Ideogenics constitutes a determination that it has the relevant experience necessary to win the contract."  Tab 25, AR 1632.  Therefore, the SBA Area Office found that Ideogenics was not "unusually reliant" on ▮▮▮▮ and ▮▮▮▮▮▮ .  Tab 25, AR 1632.

On appeal, the SBA OHA ruled that, contrary to the SBA Area Office's finding, the record evidence did not support a conclusion that Ideogenics had the requisite experience.  Tab 44, AR 2775.  The SBA OHA's decision did not focus on the Contracting Officer's responsibility to evaluate past performance, but on the fact that the record did not contain any past performance evaluation, as the SBA Area Office failed to "request, or obtain, information as to what impact Ideogenics'[] past performance had on the source selection, or how the procuring agency evaluated Ideogenics'[] past performance relative to that of ▮▮▮▮ and ▮▮▮▮▮▮ ."  Tab 44, AR 2774–75.

---

[26] Ideogenics did not provide a pinpoint citation for this decision.  The SBA OHA analysis in that case, however, did not discuss the relevance of a past performance dollar value to the "ostensible subcontractor rule."

Without that information, the SBA OHA reasoned, that "the [SBA] Area Office could only speculate as to whether ███ and ████████ past performance played a significant role in the award decision, and [the SBA] OHA has made clear that an ostensible subcontractor analysis cannot be based on 'mere speculation.'"  Tab 44, AR 2774.

Moreover, the SBA OHA explained that the record reflected that Ideogenics was required to submit "**all** relevant past performance performed in the *three year* period immediately preceding submission of the proposal and all work currently being performed[,]" and to "highlight . . . past experience in [] providing the services/tasks outlined in the solicitation, including the name of the agency, dates of performance[,] and a description of the services rendered and how it relates to the instant procurement."  Tab 44, AR 2774–75 (quoting Tab 1, AR 129–30 (bold and italics in original); Tab 18, AR 799).  Ideogenics completed SBA Form 355, reporting that it primarily performs work under NAICS Code 541511, *i.e.*, "Custom Computer Programming Services," but Ideogenics did not list any work under NAICS Code 522390, *i.e.*, "Other Activities Related to Credit Intermediation"—the Solicitation's assigned NAICS Code—or even the NAICS sector in which the Solicitation was classified.  Tab 44, AR 2775 (citing Tab 20, AR 806).  The sole reference to loan servicing experience in Ideogenics' proposal represents that, "████████
████████████████████████████████████████████████████"  Tab 2, AR 462.  Although it is true that one Ideogenics project involved "financial portfolio management" and the other "loan support," no detailed information was provided.  Tab 2, AR 463–64.  Instead, the descriptions of relevant past performance include ███████████████
████████████████████████████████████  Tab 2, AR 463–64.

In reviewing the record that was before the SBA Area Office, the SBA OHA properly evaluated whether Ideogenics' proposal reflected prior experience in loan servicing.  Tab 44, AR 2774–75.  In doing so, the SBA OHA did not make a responsibility determination, *i.e.*, a *prospective* and "broad inquiry into a firm's capabilities" to determine whether a contractor will be able to perform the contract.  *Assessment & Training Sols.*, 2011 WL 2164050, at *6 (internal quotation marks omitted); *see also* 48 C.F.R. § 9.104-1 ("To be determined responsible, a prospective contractor must[, *inter alia,*]. . . have adequate financial resources to perform the contract, or the ability to obtain them[;] be able to comply with the required or proposed delivery or performance schedule[; *and* h]ave a satisfactory performance record[.]" (italics added)).

Therefore, based on the record, the SBA OHA concluded that the SBA Area Office clearly erred in finding that the fourth *DoverStaffing* factor was not met, *i.e.*, that Ideogenics had "experience in the principal subject matter of th[e] procurement[.]"  Tab 44, AR 2775.  As such, the SBA OHA properly concluded, based "on the information . . . provided by the concern whose size status is at issue," Ideogenics did not have relevant experience, and was dependent on ████ and █████ for that experience.  *See* 13 C.F.R. § 121.1009(d).[27]

---

[27] This regulation requires that the SBA Area Office weigh the record evidence and make findings "based primarily on the information supplied by the protestor or the entity requesting the size determination and that provided by the concern whose size status is at issue."  13 C.F.R. § 121.1009(b).

For these reasons, the court has determined that the SBA OHA's ruling that Ideogenics did not have relevant past performance experience, was not contrary to law, without a rational basis, nor arbitrary and capricious.

### 4. Because It Misinterpreted Ideogenics LLC's Agreements With ███ ██████████ and ██████████████████ (Count III).

#### a. Ideogenics LLC's Argument.

Ideogenics argues that teaming agreements are necessarily preliminary, because it is industry practice to wait until after the prime contract is awarded before a formal subcontract is negotiated and finalized. Pl. Mot. at 20–21. The record reflects that the ████████████ between Ideogenics and ████ and ████████ were not final. Pl. Mot. at 21. Nevertheless, the SBA OHA prematurely decided that the non-employment provision precluded Ideogenics from hiring any employees and failed to recognize that the non-employment provision was subject to further negotiations. Pl. Mot. at 21. Each of the ████████████ requires both parties to comply with all federal and state laws and executive orders; therefore, a non-employment provision would be unenforceable, as it would prohibit Ideogenics from offering a right of first refusal to incumbent employees and violate Executive Order 13495. Pl. Mot. at 21–22. But, even if the non-employment provision is enforced to prevent Ideogenics from hiring employees from ████ and ████████, Ideogenics nevertheless could find non-incumbent personnel to perform the contract. Pl. Mot. at 22. Therefore, the SBA OHA's conclusion that Ideogenics would not be able to hire any employees to perform the work was an improper "responsibility determination." Pl. Mot. at 22–23. In addition, the SBA OHA failed to recognize that the ████████████ insured that Ideogenics could ████████████████. Pl. Mot. at 23–24 (citing Tab 2, AR 510–11, 527–28); *see also LOGMET, LLC*, SBA No. SIZ-5155, 2010 WL 4271505, at *8–9 (Oct. 6, 2010) (ruling that a prime contractor would perform the "primary and vital requirements" of the contract, where it would do the majority of work, although the prime contractor and subcontractor would perform identical services)).

#### b. The Government's Response.

The Government responds that subcontracts are not "teaming agreements," because they are not "agreement[s] to enter into . . . [future] subcontract[s.]" Gov't Resp. at 26 (citing Tab 22, AR 1402, 1419; *see also Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 939 F. Supp. 2d 572, 574–76, 581–82 (E.D. Va. 2013) (finding that a teaming agreement requires that the parties enter into a second agreement after contract award)). Therefore, the SBA OHA correctly recognized that characterizing the "agreements" in this case as ████████ "create[s] a problematic ambiguity" that "cannot be reconciled with Ideogenics' ████████████ reflected in its proposal." Gov't Resp. at 27–28 (citing Tab 22, AR 1408, 1410, 1425, 1427; Tab 44, AR 2775). In addition, Executive Order 13495 and FAR 52.222-17 require that the "right of first refusal" must be offered to employees, only if their employment under a different contract will be terminated, because of a new contract. Gov't Resp. at 28 (citing Tab 22, AR 970). In this case, the non-employment provision prevents Ideogenics from hiring the ██ employees from ██ ████████, so they would remain as employees of ████ and ████████. Gov't Resp. at 28. If these employees performed contract work, *ipso facto*, Ideogenics could not perform 51% of that work. Tab 22, AR 1323–24, 1402–03, 1419–20. Therefore, the SBA OHA's conclusion was

consistent with SBA OHA precedent that a prime contractor is "unusually reliant" on a subcontractor, where "the challenged firm's proposal was so ambiguous that it was 'unclear whether [the prime contractor] proposed to provide any contract employees at all[.]'" Tab 44, AR 2775 (quoting *Four Winds Servs., Inc.*, 2011 WL 3159674, at *5).

### c.       The Court's Resolution.

As previously discussed, when a size determination is requested, the SBA Area Office must rely "primarily on the information supplied by the protestor or the entity requesting the size determination and that provided by the concern whose size status is at issue[,]" and "including reasonable inferences from the record[.]" 13 C.F.R. §§ 121.1009(b), (e). If a SBA Area Office finding is challenged, the SBA Area Office is required to provide the SBA OHA with "the entire case file relating to that determination." *Id.* § 134.306(a). On appeal, the SBA OHA will examine the record as a whole to determine whether the SBA Area Office findings are "plausible in light of the record viewed in its entirety." *Anderson*, 470 U.S. at 574. In addition, SBA regulations require that, in conducting an "ostensible subcontractor" analysis, the content of any proposed agreements between prime and subcontractors must be considered. *See id.* § 121.103(h)(4) ("All aspects of the relationship are considered, including[] . . . agreements between the prime and subcontractor[.]").



In this case, the SBA Area Office found that, "Ideogenics' proposed subcontracting agreements with both ▆▆▆▆ and ▆▆▆▆▆▆ state that any and all communication regarding the contract shall be through Ideogenics" and concluded that Ideogenics was not "unusually reliant" on ▆▆▆▆ and ▆▆▆▆▆▆▆ to perform the contract. Tab 25, AR 1630. The SBA OHA, however, ruled that the SBA Area Office's finding that Ideogenics was not "unusually reliant" on ▆▆▆▆ and ▆▆▆▆▆▆ was clearly erroneous, because Ideogenics only ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. Tab 44, AR 2760, 2775 (citing Tab 2, AR 507–39; Tabs 14–25, AR 711–1640). The SBA OHA also considered that the subcontracts included a non-employment provision, but Ideogenics failed to reconcile that provision with its plan to hire ▆▆▆▆ and ▆▆▆▆▆▆ employees to actually perform the contract. Tab 44, AR 2775 ("Ideogenics has not explained how its plan to hire incumbent subcontractor personnel can be reconciled with the terms of the subcontracts."); *see also* Tab 2, AR 516, 533 ("The Parties mutually agree not to offer employment, nor accept for employment, each other's employees who are directly or indirectly associated with the work covered by this Subcontract[.]"). Therefore, the SBA OHA reasonably concluded based on the record that it was not clear whether Ideogenics itself could perform the work required under the contract. Tab 44, AR 2775.

The agreements at issue also bear the title ▆▆▆▆▆▆▆▆▆ and use the same term therein. Tab 2, AR 510, 527. The term ▆▆▆▆▆▆▆ appears once in a recital, referring to it as a separate agreement entered into by the parties. Tab 2, AR 510, 527. Although Ideogenics argued to the SBA OHA that the terms ▆▆▆▆▆▆ and ▆▆▆▆▆▆▆▆▆ are interchangeable, Ideogenics' proposal described the agreements as ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ and ▆▆▆▆▆▆▆▆▆▆▆▆▆ Tab 2, AR 436.

Assuming, *arguendo*, that the agreements at issue were "teaming agreements" to be negotiated in the future, it would have been improper for the SBA OHA to speculate as to what terms would be negotiated. *See* 13 C.F.R. § 121.1009(e) ("The SBA will base its formal size

determination upon the record, including reasonable inferences from the record[.]"); *see also id.* § 134.225(b) ("The record . . . will consist of all pleadings, motions, and other non-evidentiary submissions, all admitted evidence, all orders and decisions, and any transcripts of proceedings in the case."). The SBA OHA, however, determined that "it [was] not evident that Ideogenics would be able to carry out its plan to hire its workforce from its subcontractors, raising the possibility that these personnel would remain subcontractor employees, and that no Ideogenics personnel would be involved in performing the contract." Tab 44, AR 2775. In prior cases, the SBA OHA has explained that, "the concern should be if the agreement itself creates undue reliance on the subcontractor." *Maywood Closure Co.*, 2013 WL 5492242, at *8.

In the alternative, Ideogenics argues that the SBA OHA's ruling was arbitrary and capricious, because the agreements guaranteed that Ideogenics would perform the majority of work. Pl. Mot. at 23–24. But, Ideogenics failed to appreciate that the "ostensible subcontractor rule" may be violated when *either* the prime contractor does not perform the "primary and vital requirements of the contract," *or* the prime contractor is "unusually reliant" on subcontractors. *See* 13 C.F.R. § 121.103(h)(4). In this case, the SBA OHA determined that whether Ideogenics performed the "primary and vital requirements" of the contract was immaterial, because that fact "does not preclude a finding [in this case] that Ideogenics [was] *unusually reliant* [on] its subcontractors based on the *DoverStaffing* line of cases." Tab 44, AR 2776 (italics added).

For these reasons, the court has determined that the SBA OHA's interpretation of Ideogenics' agreements with ███████ and ████████ was not contrary to law, without a rational basis, nor arbitrary and capricious.

### 5. Because It Incorrectly Assessed Ideogenics LLC's Management Control (Count V).

#### a. Ideogenics LLC's Argument.

The proposal submitted to HUD represented that Ideogenics would maintain full control over contract performance and program management. Pl. Mot. at 25–26 (citing Tab 2, AR 436 ("█████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

█████████████████")). The record also evidences that Ideogenics' CEO ██████████████ ████████████████████████████████████ Tab 2, AR 463, 574. Therefore, the SBA OHA had no basis for concluding that Ideogenics' CEO would not ███████████████ ████████████████. Pl. Mot. at 26.[28] Likewise, the SBA OHA's conclusion that the non-employment provision prohibited Ideogenics from hiring the Contract Manager and Alternate Contract Manager, ████████████████████████████████████████████████████ ██████████████, was not substantiated. Pl. Mot. at 27.

---

[28] Ideogenics did not provide any citations to the Administrative Record to support this argument.

The SBA OHA also incorrectly analogized this case to *Charitar Realty*. Pl. Mot. at 30. In that case, Charitar's Program Manager did not report to anyone nor have a role in contract performance; that is not the case here. Pl. Mot. at 31–32.[29]  In addition, *DoverStaffing* is not controlling, because the proposal in that case "did not assign a major role to the [the contractor's] President; the subcontract provided for [shared] oversight authority between the prime contractor and subcontractor; and the prime contractor intended to hire all of its key employees from the subcontractor." Pl. Mot. at 32 (citing *DoverStaffing, Inc.*, 2011 WL 7101064, at *8–9). In contrast, Ideogenics' CEO will have final authority to control the Contract Manager and Alternate Contract Manager. Tab 2, AR 435 ("Both of these individuals will be Ideogenics employees as stipulated in section 4.5 of the RFP."). In addition, the ▮▮▮▮ and ▮▮▮▮▮▮ agreements do not provide for shared oversight authority with Ideogenics. Pl. Mot. at 32. Therefore, the SBA OHA erroneously assumed that subcontractor involvement would impede Ideogenics' control over contract performance. Pl. Mot. at 26.

Ideogenics' proposal evidences that ▮▮▮▮ and ▮▮▮▮▮ will perform subordinate duties but not exert significant control over contract performance. Tab 2, AR 431–32; *see also A-P-T Research*, 2016 WL 8198438, at *11[+] (ruling that where there was more than one subcontractor, a lack of control by the prime contractor cannot be presumed). The SBA Area Office correctly found that ▮▮▮▮ and ▮▮▮▮▮ would incur ▮▮▮% and ▮▮▮%, respectively, of the labor costs under the contract; but, together they would receive only ▮▮▮% of the amount paid by HUD. Tab 25, AR 1630–31. Therefore, the agreements with ▮▮▮▮ and ▮▮▮▮▮▮ support the SBA Area Office's findings regarding labor costs and government payments, evidencing that Ideogenics' management would be in control of contract performance. Pl. Mot. at 28 (citing Tab 2, AR 510–11, 527–28; Tab 24, AR 1620–21). Accordingly, the SBA OHA's ruling that Ideogenics would not control contract performance was contrary to precedent and the record. Pl. Mot. at 28.

### b.    The Government's Response.

The Government points out that, if Ideogenics cannot hire any employees, all employees necessarily will be supervised by ▮▮▮▮ and ▮▮▮▮▮▮, over which Ideogenics will have no control. Gov't Resp. at 33 (citing Pl. Br. at 26). Although Ideogenics touts the CEO's past professional experience as a ▮▮▮▮▮▮▮▮▮▮, that does not evidence how he will exercise management control on *this* contract. Gov't Resp. at 33 (citing Tab 44, AR 2777 (discussing the CEO's relatively minor role)). Therefore, the SBA OHA reasonably concluded that "Ideogenics'[] CEO appears to be the only current Ideogenics staff member referenced in its proposal, but he has no major role on the contract beyond interfacing with the Contract Manager, Alternate Contract Manager, and the ▮▮▮▮, which Ideogenics concedes is merely an advisory committee conforming to ordinary contractor meeting practices." Tab 44, AR 2777. The fact that Ideogenics has two subcontractors, rather than one, also is not dispositive, because the awardee is the party responsible for performance. *See Competitive Innovations, LLC*, SBA No. SIZ-5369, 2012 WL 8717518, at *17[+] (Sept. 17, 2012) ("The key issue is not that [the prime contractor] would utilize multiple subcontractors, but that [the prime contractor] itself will have no role in performing the contract's primary and vital requirement.").

---

[29] Ideogenics did not provide any citations to the Administrative Record or to *Charitar Realty*, 2017 WL 542185, to support this argument.

### c.      Ideogenics LLC's Reply.

Ideogenics replies that after *DoverStaffing*, the SBA OHA has ruled that hiring key personnel from subcontractors is not *per se* evidence of affiliation or undue reliance.  Pl. Reply at 3 (citing *InGenesis, Inc.*, 2013 WL 393479, at *15–16 ("[T]he use of two current [subcontractor] employees . . . as key personnel does not create unusual reliance"); *Maywood Closure Co.*, 2013 WL 5492242, at *9[+] (determining entities were not affiliated, despite the fact that a subcontractor employee was proposed as a project manager, because he would be employed by the prime contractor after contract award); *NVE, Inc.*, SBA No. SIZ-5638, 2015 WL 2342883, at *10[+] (Feb. 6, 2015) (no undue reliance where the project manager was a prime contractor employee under the control of the prime contractor's President); *Nat'l Sourcing, Inc.*, SBA No. SIZ-5305, 2011 WL 6183625, at *12[+] (Dec. 7, 2011) (no undue reliance where mid-level managers who were subcontractor employees nevertheless would be subordinate to the prime contractor)).



In this case, the Contract Manager and Alternate Contract Manager are incumbent employees, who will become Ideogenics employees after contract award and report to Ideogenics' CEO at that time.  Pl. Reply at 4.  As such, the SBA OHA "failed to provide a rational explanation as to why and how the incumbent subcontractors can control the ███ [,] once they become [Ideogenics] employees[.]"  Pl. Reply at 4.  In fact, Ideogenics' subcontracts with ███ and ███  state that ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████  Pl. Reply at 4 (quoting Tab 2, AR 518).  Therefore, neither ███ nor ███ would exercise control over these employees, because Ideogenics █████████████.  Pl. Reply at 4–5.

Nor did the SBA OHA credit Ideogenics with having ███████████ wherein it would █████████████████████████, including █████████████████████  Pl. Reply at 5 (quoting Tab 2, AR 436).  This "shows that Ideogenics not only would hire independent employees [if] incumbent employees reject [an] employment offer, but also would ████████████████ ████████████████████████████████  Pl. Reply at 5 (italics in original).  As Ideogenics explained, ███████████████ ████████████████████████████████ ████████████████████████████████ ██████████████  Tab 2, AR 437.

### d.      The Government's Reply.

The Government adds that, since Ideogenics also must rely on ███████ to provide facilities for contract performance, it is clear that Ideogenics "bring[s] little to the contract beyond [Ideogenics'] small business size status, when it is [using] both . . . staff *and* facilities from [the] subcontractors."  Gov't Reply at 10 (italics in original).

### e.      Equity Mortgage Solutions, LLC's Reply.

EMS restated that Ideogenics' proposal requires that the Contract Manager and Alternate Contract Manager are ███████████████████████████████ so in fact, the CEO will not have control over performance.  Int. Reply at 4, 6–7 (citing Tab 22, AR 1302, 1306, 1309–10, 1327, 1328).  In support, EMS refers to the ████████████████ that shows Ideogenics reporting directly to the ESG, including subcontractor representatives.  Int. Reply at 4–5 (citing Tab 2, AR 438; Tab 22, AR 1330).  In addition, Ideogenics' proposal does not show that the CEO will have any control over performance, other than "being identified on the proposal's cover page . . . and referenced ██████████████████████████████ "  Int. Reply at 5 (citing Tab 22, AR 1290; Tab 22, AR 1354–55).

### f.      The Court's Resolution.

The SBA Area Office found that Ideogenics would manage contract performance, because

> [Ideogenics' ██████████████ shows that the ultimate supervisory roles for contract performance, the Contract Manager and Alternate Contract Manager, will both be Ideogenics employees[,] [although] the mid-level supervisory staff . . . are all assigned to ██████ [and] █████████. . . . Additionally, the proposal states that Ideogenics takes ultimate responsibility over all subcontractor action . . . and may take corrective action to remedy [poor performance].  It further stipulates that the Ideogenics Contract Manager is, ██████████ ████████  Furthermore, Ideogenics' proposed subcontracting agreements with both ██████ and █████████ state that any and all communication regarding the contract shall be through Ideogenics.  Accordingly, the mid-level managers employed by ██████ and █████████ are subordinate to the Ideogenics Contract Manager who in turn reports . . . directly to [the] Ideogenics CEO.
>
> *      *      *
>
> [T]he proposed management approach and subcontractor agreements . . . make clear that Ideogenics will not only manage the contract, but will be ultimately responsible for performance by both its employees and those of its subcontractors.

Tab 25, AR 1629–32 (alteration in original).

The SBA OHA, however, ruled that the SBA Area Office clearly erred in finding that Ideogenics would manage contract performance on the basis that "the existing Contract Manager and Alternate Contract Manager" will be "Ideogenics employees."  Tab 44, AR 2760–61, 2775; Tab 2, AR 435.  As EMS pointed out, Ideogenics' proposal included a ████████████ ████████ among Ideogenics, ██████, and █████████, and stated that "all of Team Ideogenics['] proposed Key Personnel are currently working in the same or similar roles on the [incumbent contract].  Team Ideogenics has executed all employment agreements and Letters of Commitment for all proposed key personnel."  Tab 2, AR 431–32, 435; Tab 44, AR 2760.  The subcontracts between Ideogenics and ██████ and █████████ also state that the "Subcontractor's personnel who are to perform the services shall be under the employment, and ultimate control, management, and supervision of the subcontractor[,]" and prohibited Ideogenics from employing any current ████████

or ███████ employees.  Tab 2, AR 516, 518, 533, 535; Tab 44, AR 2760–61.  Therefore, the SBA OHA reasonably concluded that, "[a]ccording to the proposal, the Contract Manager and Alternate Contract Manager will be supervised by Ideogenics'[] [CEO, who] . . . . is assisted by the [ESG], . . . includ[ing] representatives from . . . ███████, and ███████."  Tab 44, AR 2760.

Based on this evidence, the SBA OHA concluded that Ideogenics would not manage contract performance, because the subcontracts at issue

> prevent or restrict Ideogenics from managing and supervising its subcontractors' work, [which] is suggestive of unusual reliance.  It is settled law that "[a]mong the main considerations in ostensible subcontractor analysis [is] which concern will be managing the contract."  *DoverStaffing*, [2011 WL 7101064], at [*]8. . . . Second, the subcontracts also provide that *subcontractor employees "shall be under the employment, and ultimate control, management, and supervision of the Subcontractor."*
>
> *       *       *
>
> [*In fact, four*] *of the proposed six key personnel, as well as many of the mid-level managerial staff, will be subcontractor employees, and the terms of the subcontract agreements appear to restrict Ideogenics from directly managing its subcontractors or from hiring the proposed Contract Manager and Alternate Contract Manager, who are current* ███████ *employees*. . . . Ideogenics'[] CEO appears to be the only current Ideogenics staff member referenced in its proposal, but *he has no major role on the contract* beyond interfacing with the Contract Manager, Alternate Contract Manager, and the [ESG], which . . . is merely an advisory committee conforming to ordinary contractor meeting practices. . . . [The SBA OHA] has held that tangential involvement by the prime contractor's senior leadership is insufficient to dissipate unusual reliance on a subcontractor."

Tab 44, AR 2775–76 (some citations omitted) (italics added).

Therefore, the SBA OHA properly relied on record evidence in ruling that the SBA Area Office clearly erred in finding that Ideogenics would manage contract performance.

Nevertheless, Ideogenics argues that *A-P-T Research* stands for the proposition that collective support by more than one subcontractor precludes a finding that a prime contractor will not control contract performance.  Pl. Mot. at 8.  *A-P-T Research*, however, does not stand for the proposition that having multiple subcontractors prevents a prime contractor from being "unusually reliant."  Instead, that case observed only that multiple subcontractors "reduce[] the likelihood that [the contractor] will be reliant upon *any one* of them."  *A-P-T Research*, 2016 WL 8198438, at *13 (italics added).  Therefore, the SBA OHA properly determined that "it is possible to find a violation of the ostensible subcontractor rule[,] even when a prime contractor will utilize multiple subcontractors."  Tab 44, AR 2777 (citing *Competitive Innovations, LLC*, SBA No. SIZ-5369, 2012 WL 8717518 (Sept. 25, 2012) (determining the "ostensible subcontractor rule" was violated where the prime contractor proposed four subcontractors who would perform the majority of the work)).

For these reasons, the court has determined that the SBA OHA's ruling that Ideogenics was "unusually reliant" on subcontractors to manage contract performance, was not contrary to law, without a rational basis, nor arbitrary and capricious.

### 6. Because It Excluded Evidence On Appeal And Ruled That Ideogenics LLC Was "Unusually Reliant" On A Subcontractor For Facilities (Count IV).

#### a. Ideogenics LLC's Argument.

Ideogenics argues that the SBA OHA violated 13 C.F.R. § 134.308[30] by not admitting the ▮▮▮▮▮▮▮▮ to evidence that Ideogenics would pay a fair market price for the commercial facilities required to perform the contract. Pl. Mot. at 24 (citing Tab 39, AR 2716; Tab 40, AR 2736).

#### b. The Government's Response.

The Government responds that the ▮▮▮▮▮▮▮ is not relevant to Ideogenics' "dependence on . . . subcontractor ▮▮▮▮▮▮ to obtain the [facility] it intends to use." Gov't Resp. at 30–31. In any event, Ideogenics did not provide the ▮▮▮▮▮▮▮ to the SBA Area Office for consideration in the initial size determination. Gov't Resp. at 31 (citing Tab 21, AR 832 (Ideogenics' submission to the SBA Area Office, without the ▮▮▮▮▮▮)). Therefore, the SBA OHA did not need to consider the ▮▮▮▮▮▮, because the record otherwise sufficiently evidenced that Ideogenics did not have the necessary facilities to perform the contract. Gov't Resp. at 31–32 (citing Tab 44, AR 2775–76; *see also* Tab 21, AR 832; Tab 22, AR 1300–01, 1303, 1740). Although Ideogenics claimed that it would ▮▮▮▮▮▮▮, it never did. Gov't Resp. at 16 (citing Tab 21, AR 832; Tab 22, AR 1740, 1775). Therefore, the "SBA OHA rationally concluded that Ideogenics [relied on] subcontractors to meet this key solicitation requirement, [that] is suggestive of unusual reliance." Gov't Resp. at 16.

#### c. Equity Mortgage Solutions, LLC's Response.

EMS adds that Ideogenics never properly moved to admit the ▮▮▮▮▮▮. Int. Resp. at 26, 28. Moreover, Ideogenics' reliance on ▮▮▮▮▮▮ to provide facilities and equipment in a "turnkey manner" was an indication of undue reliance, under SBA OHA precedent. Int. Resp. at 27 (citing Tab 22, AR 1306; *Femme Comp, Inc.*, SBA No. SIZ-2689, 1987 WL 93650, at *9 (June 12, 1987) ("[T]he total dependence of a prime contractor on a subcontractor for space and other facilities cannot help but give power of control to the subcontractor, especially during the actual performance period.")). Therefore, the SBA OHA's decision is "entitled to a presumption of regularity and must be upheld as long as a rational basis is articulated and relevant factors are considered." *See Emery Worldwide Airlines v. United States*, 264 F.3d 1071, 1085 (Fed. Cir. 2001).

---

[30] This regulation provides that "[e]vidence not previously presented to the [SBA] Area Office which issued the size determination being appealed will not be considered[,]" unless the SBA OHA "orders the submission of such evidence" or the party files and serves a motion "establishing good cause for the submission of such evidence." 13 C.F.R. § 134.308(a).

### d.     The Court's Resolution.

SBA regulations provide that "[e]vidence not previously presented to the [SBA] Area Office which issued the size determination being appealed will not be considered[,]" unless the SBA OHA "orders the submission of such evidence" or the party files and serves a motion "establishing good cause for the submission of such evidence." 13 C.F.R. § 134.308(a).  As the SBA OHA's November 16, 2017 decision stated, new evidence must be "relevant to the issues on appeal, . . . [must] not unduly enlarge the issues, and [must] clarif[y] the facts on appeal." Tab 44, AR 2772 (quoting *Vista Eng'g Techs., LLC*, SBA No. SIZ-5041, 2009 WL 1892558, at *4 (June 5, 2009)).  Accordingly, the SBA OHA "'will not accept new evidence when the proponent unjustifiably fails to submit the material to the [SBA] Area Office during the size review.'"  Tab 44, AR 2772 (quoting *Project Enhancement Corp.*, SBA No. SIZ-5604, 2014 WL 5421284, at *8 (Oct. 6, 2014)).



In this case, Ideogenics did not submit the ████████ to the SBA Area Office, so it was not considered in the SBA Area Office's findings and it could not be considered relevant to the issues before the SBA OHA on appeal. Tab 44, AR 2772; *see also* Tabs 14–24, AR 711–1640 (SBA Area Office file); Tab 39, AR 2715 (Ideogenics' motion for leave to submit the ████████, describing it as ████████).  Accordingly, the SBA OHA's decision to exclude the ████████ was consistent with 13 C.F.R § 134.308(a) and controlling precedent.

Ideogenics' alternative argument that the SBA OHA improperly considered the ████████ is not supported by the record.  Tab 44, AR 2759, 2771–77.  Instead, the SBA OHA's decision recited that the Solicitation required the contractor to "establish a fully equipped office within 50 miles of Tulsa or Oklahoma City, OK[.]" Tab 44, AR 2759 (quoting Tab 1, AR 208).  The SBA OHA concluded that Ideogenics did not "have the necessary facility to perform this contract, a requirement of the RFP[,]" because its proposal stated ████████ ████████ Tab 44, AR 2760 (quoting Tab 2, AR 410), 2775.  In support, the SBA OHA cited two decisions. Tab 44, AR 2775–76.  The first was *Modus Operandi*, where the solicitation required offerors to respond to sample technical problems, but the protested firm did not have personnel with relevant experience, without relying on a subcontractor. Tab 44, AR 2776 (citing *Modus Operandi*, 2016 WL 921996, at *13 ("It therefore appears questionable whether Appellant could have participated in this competition without assistance from [the subcontractor] in addressing the technical scenarios.")).  The second was *Professional Security Corporation*, where the SBA OHA explained, "the . . . Appellant may also be reliant on [a subcontractor] for support services essential to performing the contract." Tab 44, AR 2776 (citing *Prof'l Sec. Corp.*, 2014 WL 1743488, at *9 n.3).  In this case, physical facilities were an important contractual requirement. Tab 1, AR 208.  Therefore, the SBA OHA reasonably determined that Ideogenics' reliance on subcontractors to fulfill this requirement evidenced "unusual reliance."

Therefore, the court has determined that the SBA OHA's decision to exclude the ████████ was not contrary to law, without a rational basis, nor arbitrary and capricious.  Likewise, the court has determined that the SBA OHA's ruling that Ideogenics was "unusually reliant" on ████████

and ███████ to provide the facilities required to perform the contract was not contrary to law, without a rational basis, nor arbitrary and capricious.

## IV.   CONCLUSION.

For these reasons, Ideogenics' February 5, 2018 Motion For Judgment On The Administrative Record is denied.  All other pending motions are denied as moot.  The Clerk of the United States Court of Federal Claims is directed to dismiss the December 13, 2017 Complaint.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Chief Judge**